**PROCESS GAS CONSUMERS GROUP, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Tennessee Gas Pipeline Company, et al., Intervenors.**

Nos. 98–1075, 98–1089.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1999.

Decided May 21, 1999.

As Amended Aug. 4, 1999.

Edward J. Grenier, Jr. argued the cause for petitioners. With him on the briefs were Gregory K. Lawrence, Harvey L. Reiter, Barbara K. Heffernan and Debra Ann Palmer.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Michael J. Fremuth argued the cause for intervenor. With him on the brief was Shemin V. Proctor. Robert M. Lamkin, Barbara K. Heffernan and Debra Ann Palmer entered appearances.

Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Tennessee Gas Pipeline Company ("Tennessee") filed a tariff revision with the Federal Energy Regulatory Commission ("FERC" or "Commission") in 1996. The company sought to change the method it uses to allocate requests for available capacity on its natural gas pipeline, switching from "first come-first served" to "net present value," or "NPV." Over objections, FERC ultimately approved a twenty-year cap on bids evaluated under NPV. It also approved the use of NPV to evaluate requests from shippers to change the primary points at which their gas enters or leaves the pipeline. Numerous petitioners argue that FERC failed to engage in reasoned decision making in both instances in violation of the Administrative Procedure Act ("APA"). Petitioners also contend that Tennessee did not give sufficient notice that NPV would apply to point change requests. We agree with both of petitioners' APA claims and therefore grant the petitions for review, remanding the issues to FERC, but hold that petitioners lack standing to raise the notice claim.

## I. BACKGROUND

Tennessee transports natural gas via a pipeline system from Louisiana, Texas, and the Gulf of Mexico to areas as far north as New England. Prior to the orders at issue in this case, Tennessee awarded available firm capacity[1] on the pipeline on a first come-first served basis; the first shipper to submit a request that satisfied the requirements of Tennessee's tariff received the capacity. The pipeline found that method unsatisfactory:

> Under the first come-first served policy, Tennessee must award capacity to any shipper, even one that requests service for a very short term (which could be for as little as just a few days), if the short-term shipper satisfactorily submits its request for service as little as one hour before a long term shipper submits its request for service. Plainly, an efficient market would not function in this way, as a merchant exercising rational business judgment would typically favor a creditworthy long-term customer (even if the long-term customer requested a reasonable discount) that ... would provide more overall benefits than those provided by the short-term customer. Similar inefficiencies arise where a short-haul shipper submits its request for service prior to another shipper that wishes to transport gas to points further downstream or upstream.

Letter from Marguerite N. Woung, Attorney, Tennessee Gas Pipeline Company, to Lois D. Cashell, Secretary, FERC 3 (June 12, 1996). Pursuant to section four of the Natural Gas Act, 15 U.S.C. § 717c, Tennessee therefore submitted tariff revisions to FERC on June 12, 1996, proposing a change from the first come-first served method of evaluating capacity requests to the NPV method.[2] The change would be

---

1. "Pipelines generally offer two forms of transportation service: firm transportation, for which delivery is guaranteed, and interruptible transportation, for which delivery can be delayed if all the capacity on the pipeline is in use." *United Distribution Cos. v. FERC,* 88 F.3d 1105, 1123 n. 10 (D.C.Cir. 1996); *see Municipal Defense Group v. FERC,* 170 F.3d 197, 198 n. 1 (D.C.Cir.1999).

2. The same submission involved another tariff revision—elimination of the requirement that pipeline service commence within ninety days of a request for service—that is not at issue here.

accomplished through the addition to Tennessee's tariff of a new section five, entitled "Awards of Generally Available Capacity." Under NPV, Tennessee would announce an open season each time it wanted to sell available capacity. The highest bidder during the open season, based on the net present value of the bid, would receive the capacity (absent unusual circumstances). This approach would take into account differences in the proposals such as price, volume of gas, and duration of contract. Using more technical language, Tennessee described the NPV of a bid as the "discounted cash flow of incremental revenues per dekatherm to Transporter produced, lost or affected...."

## A. The Twenty–Year Cap

Tennessee's initial proposal did not include or discuss a cap on the length of a bid that would be considered in NPV calculations. A cap may prevent an end run around the maximum rates approved by FERC, a concern when monopoly conditions are present. See United Distribution Cos. v. FERC, 88 F.3d 1105, 1140 (D.C.Cir.1996) ("UDC") ("Competing bidders who come up against the rate ceiling for this scarce resource—capacity on constrained pipelines—may bid up the length of the contract term to try to win the auction. In effect, bidding for a longer contract term becomes a surrogate for bidding beyond the maximum rate level."). A cap functions like this: under a ten year cap, two shippers who want to submit otherwise identical fifteen and twelve year bids cannot; they are limited to ten year bids, producing the same NPV, and a tiebreaker determines the winner.[3] Without the cap, the fifteen year bidder wins. The goal of a cap in a monopoly situation, just as with the setting of maximum rates, is to simulate the end product of a competitive market. See Stephen G. Breyer & Richard B. Stewart, Administrative Law and Regulatory Policy 237 (3d ed.1992) ("In

principle, ratemaking might be thought to have as its object the setting of prices equal to those that the firm would set if it did not have monopoly power; i.e., to replicate a 'competitive price.' "). Bids in a competitive market limited in duration to ten years thus help to prevent a pipeline's market power from causing market distortions.

A month after its June 12 filing, Tennessee addressed concerns raised by Process Gas Consumers Group ("Process Gas"), an association of industrial users of natural gas and one of the petitioners here, about the lack of a cap. Instead of incorporating a cap in the tariff itself, however, Tennessee stated that it would "include a cap on the duration of any bid as part of the open season posting ... that is applicable to the particular service being offered." Response of Tennessee Gas Pipeline Company to Protests to NPV Filing at 6.

FERC ruled on Tennessee's proposed revisions on July 31, 1996, generally approving of the switch from first come-first served to NPV:

> A net present value evaluation ... allocates capacity to the shipper who will produce the greatest revenue and the least unsubscribed capacity. As such, it is an economically efficient way of allocating capacity and is consistent with Commission policy.

Tennessee Gas Pipeline Company, 76 F.E.R.C. ¶ 61,101, at 61,522 (1996) ("Tennessee Gas I"). FERC was not wholly satisfied, however, and while it accepted the filing (with a minimal suspension period), it did so subject to certain conditions. One condition involved the cap: "Tennessee should explain why it proposes to vary the cap on a transaction by transaction basis rather than include a uniform cap in its tariff." Id. at 61,519. In response, Tennessee proposed a twenty-year cap: "Since bids beyond the 20th year are un-

---

**3.** A cap could function somewhat differently, permitting the filing of the fifteen and twelve year bids but only counting the first ten years in the NPV calculation. The winner would then obtain a contract for longer than ten years. Tennessee's cap does not appear to work this way.

likely to have a significant impact on the NPV analysis, Tennessee is willing to include in its tariff a 20–year limitation on the NPV bids." Letter from Marguerite N. Woung, Attorney, Tennessee Gas Pipeline Company, to Lois D. Cashell, Secretary, FERC 6 (Aug. 15, 1996).

During the same time period, a cap had become an issue in a different circumstance arising out of FERC's Order No. 636, part of the restructuring of the natural gas industry. In our review of Order No. 636, we addressed a twenty-year cap selected by FERC in the right-of-first-refusal context.[4] Because FERC failed to adequately explain why twenty years would protect shippers from pipelines' market power and why it relied on the lengths of one specific type of contract (those involving the construction of new facilities) in coming up with that figure, we remanded the cap for a better justification. *See UDC*, 88 F.3d at 1140–41. On February 27, 1997, FERC acknowledged on remand that it could not offer a more adequate basis for a twenty-year cap, *see Order No. 636–C, Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation Under Part 284 of the Commission's Regulations, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, 78 F.E.R.C. ¶ 61,186, at 61,773 (1997) ("Order No. 636–C") ("The Commission can find no additional record evidence, not previously cited to the Court, that would support a cap as long as the twenty-year cap chosen in Order No.

636."), and reduced the cap to a five-year one. *See id.* at 61,774.[5] Process Gas, which asked for a cap of ten years in a June 24, 1996 response to Tennessee's initial filing and in an August 30, 1996 request for rehearing of *Tennessee Gas I*, reduced its request to five years in light of Order No. 636–C on April 11, 1997.[6]

FERC approved the twenty-year cap for NPV on June 3, 1997:

> Differing economic environments may dictate differing durations of service if Tennessee is to generate maximum use of its system and maximum revenues. Market forces can be the determinant of duration of service, and to place a uniform cap in place could stifle those forces. Protesters have not offered persuasive arguments for either a uniform cap, or for a cap shorter than twenty years. The Commission disagrees with Process Gas that the policy justifications of Order No. 636–C apply similarly to this situation. As Tennessee points out, in Order No. 636–C, the five-year cap is imposed to protect existing customers from being forced into longer-term contract extensions than they desire under the right-of-first-refusal. Here, there is no reason for the Commission to impose a shorter cap for new capacity, unlike the case of capacity subscribed under existing contracts. Under the instant proposal, market forces can determine the duration of service for the new, or newly available capacity within whatever cap Tennessee proposes for that particular transaction. Bidders are not forced

---

**4.** We described that context as follows:

> The right-of-first-refusal mechanism consists principally of two matching requirements: rate and contract term. Near the end of a long-term firm-transportation contract, the existing customer may notify the pipeline that it intends to exercise its right of first refusal. The pipeline must post the availability of that capacity on its electronic bulletin board and, in accordance with the criteria set forth in its tariff, identify the "best bid" offered by any competing shippers. The customer then has the right to match the competing bid's rate, up to the maximum "just and reasonable" rate that the Commission has approved for that ser-

> vice, and the competing bid's contract term. Competing shippers may choose to bid for only a portion of the capacity in the expiring contract.

*UDC*, 88 F.3d at 1138 (internal citations omitted).

**5.** A petition for review of the cap selected in Order No. 636–C is currently pending. *See Interstate Natural Gas Ass'n of America v. FERC*, No. 98–1333 (D.C.Cir. filed July 22, 1998) (in abeyance).

**6.** Process Gas was not the only party to argue that Tennessee's proposed twenty-year cap was too long.

into the maximum duration which in any event is limited to no more than twenty years. Rather, the primary issue here, is whether when two shippers both desire new capacity should that capacity go to a shipper who values it more, *i.e.*, for a longer term, than another shipper who might value it less. The Commission will accept Tennessee's proposal.

*Tennessee Gas Pipeline Company*, 79 F.E.R.C. ¶ 61,297, at 62,339 (1997) ("*Tennessee Gas II*") (footnote omitted). In a footnote, FERC added:

The Commission considers twenty years to be the maximum length of time that can be considered reasonable in this context. Any longer or the consideration of unlimited periods of time would be allowing an unduly discriminatory exercise of monopoly power.

*Id.* at 62,339 n. 11. Rehearing of *Tennessee Gas I* was denied at the same time. *See id.* at 62,334. On January 14, 1998, FERC denied rehearing of *Tennessee Gas II* and again rejected objections to a cap length of twenty years:

The Commission does not find the application of the 20–year NPV criteria to be an application of monopoly power in and of itself. Even though Tennessee has monopoly power irrespective of the length of the contract term, it still must have a rational way of allocating available capacity. Process Gas simply raises speculation that the cap will lead to unreasonable results. A 20–year cap is consistent with Commission policy of allowing those who value capacity the highest, including those who value longer-term contracts, to acquire the capacity. In fact, we believe that with the lower turnover in contracts with such a cap, economic efficiency is increased, and the public interest is better served. Nor is the right-of-first-refusal. matching procedure relevant. The right-of-first-refusal procedure was formulated with the purpose of protecting the existing shipper. Here, the existing shipper has no more stake in the outcome of the bidding process regarding newly available capacity than any other shipper and has no right to that capacity which requires protection. Accordingly, based on the foregoing, and without any evidence that 20 years is unjust and unreasonable in this context, we find that the 20–year cap is adequately supported.

*Tennessee Gas Pipeline Company*, 82 F.E.R.C. ¶ 61,008, at 61,026–27 (1998) ("*Tennessee Gas III*") (footnotes omitted). FERC further justified its approval by stating that "[i]t is still common to find longer lengths of commitment for new service." *Id.* at 61,026 n. 6. In support of that proposition, FERC cited three of its previous decisions involving ten and fifteen year agreements, known in the industry as "precedent agreements," between shippers and pipelines for capacity on yet to be constructed facilities.[7] *See id.* The pipelines, seeking authority from FERC to proceed with the planned construction, submitted the agreements to demonstrate demand for the new capacity.

## B. *Meter Amendments*

When natural gas is shipped through a pipeline, the points at which the gas enters and leaves the system are called "receipt" and "delivery" points, respectively. A firm transportation shipper selects "primary" receipt and delivery points; these points are part of its contract with the pipeline. Designating a point as primary guarantees the shipper use of the point, an important right when the pipeline lacks sufficient capacity at the point to satisfy demand. Firm shippers can select other points on a secondary basis, but can only use those points if there is sufficient capacity beyond that taken by shippers using them on a primary basis. A change in a primary receipt or delivery point is sometimes referred to as a "meter amendment" because gas is measured at these points. Section

---

**7.** FERC miscited the third of these decisions. The correct citations are: *Transcontinental Gas Pipe Line Corp.,* 81 F.E.R.C. ¶ 61,104 (1997); *Tennessee Gas Pipeline Co. and Distri-* *gas of Massachusetts Corp.,* 79 F.E.R.C. ¶ 61,-375 (1997); *Northern Natural Gas Co.,* 79 F.E.R.C. ¶ 61,046 (1997).

4.7 of Tennessee's relevant rate schedule discusses meter amendments:

> Change of Primary Points: Subject to agreement by Transporter, a Shipper may elect to substitute new points for the Primary Delivery or Receipts in its service agreement. Such changes may be affected by prior notice to Transporter of 30 days if in writing or 15 days if by the TENN–Speed 2 [electronic bulletin board] system. All such changes must be reflected in an amended service agreement and shall be effective at commencement of the following month. Transporter shall not be required to accept an amendment if there is inadequate capacity available to render the new service or if the change would reduce the reservation charges applicable to the agreement.

In *Tennessee Gas I*, issued on July 31, 1996, FERC did not discuss the effect of the change from first come-first served to NPV on the meter amendment process. Nor had the matter been explicitly addressed to that point by Tennessee or other interested parties. On August 21 or 22, 1996, however, in a posting on its electronic bulletin board Tennessee made crystal clear that it would apply the new method to primary point change requests. A meter amendment request would trigger an open season and the requestor would have to compete with other interested shippers on the basis of NPV.

A number of parties protested, arguing, *inter alia*, that applying NPV to meter amendment requests is inconsistent with FERC's professed aim of assuring that firm shippers have receipt and delivery point flexibility, *see Tennessee Gas II*, 79 F.E.R.C. at 62,335–36 & n. 5, and that the change would "give new customers a priority over existing customers since the existing customers['] NPV will be zero."[8] *Id.* at 62,337. FERC disagreed:

The Commission considers that the NPV criteria may be rightfully applied to requests for changes in receipt and delivery points. A request for a change in a receipt or delivery point is a request for capacity that is generally available at that new point. To apply the NPV criteria is to allocate that capacity to the entity that values it the most, and this is consistent with Commission policy. The Commission has previously discussed the desirability of the economic efficiency achieved by allocating capacity to parties who value it the most. Here, Tennessee seeks to allocate available receipt and delivery point capacity to the parties who value it the most, a proposal that is not inconsistent with Commission policy. Existing shippers have the right to bid on the generally available receipt and delivery point capacity, just as new or other existing shippers do. There is no reason to grant a preferential right to unsubscribed capacity to existing shippers. Moreover, nothing in these changes affects the rights of parties to use these points on a secondary basis. The Commission considers that in responding to short term changes, such as a temporary *force majeure* event (as in New England's example of a hurricane), use of an open receipt point on [a] secondary basis would be both logical and unaffected by the NPV proposal.

*Id.* (footnotes omitted).

In denying rehearing of *Tennessee Gas II*, FERC again rejected objections to its approval of Tennessee's application of the new NPV allocation method to meter amendment requests, *see Tennessee Gas III*, 82 F.E.R.C. at 61,027–29, despite arguments by existing shippers that using NPV severely degrades their service because of increased difficulty in obtaining point changes. The shippers also argued

**8.** The source of existing shippers' difficulty under NPV is that Tennessee calculates the magic NPV number by looking at the net or incremental gain in revenue that the award of the capacity at the designated point will produce. If an existing shipper seeks merely to change from one primary point to another in the same zone, its payments to the pipeline will not change and the NPV of its bid will be zero; the amount it was already obligated to pay under the contract counts for nothing.

on rehearing that using NPV for meter amendment requests is unduly discriminatory because even a *de minimus* bid from a new shipper creates some incremental value while a point change request from an existing shipper produces an NPV of zero. *See id.* at 61,028.

As we understand it, FERC's response reflects two propositions. First, allocating capacity to the highest bidder is appropriate because it is efficient. Second, existing shippers, at least in some cases, are able to compete with new shippers on the basis of NPV for capacity at a receipt or delivery point. With respect to the latter, FERC stated:

> Moreover, there are other ways an existing shipper's bid can render incremental value. If it is paying a discounted rate, it can increase the rate offered. It also can increase the amount of overall capacity requested or extend the zones its service covers.

*Id.* at 61,028 n. 17. Responding to the example of the *de minimus* bidder who would trump the existing shipper of whatever amount, FERC replied that "[i]t is economically more efficient to award the capacity to the bidder who is willing to pay something extra for that capacity." *Id.* at 61,029.

## II. DISCUSSION

Process Gas filed a petition for review of *Tennessee Gas I, Tennessee Gas II,* and *Tennessee Gas III* on February 23, 1998.[9] Numerous parties, including Tennessee, intervened. Bay State Gas Company ("Bay State") and other natural gas companies that operate in the northernmost zone of Tennessee's pipeline system filed

9. An earlier petition for review filed by Process Gas was dismissed as premature. *See Process Gas Consumers Group v. FERC,* No. 97-1458, 1997 WL 811783 (D.C.Cir. Nov.4, 1997).

10. The statutory standards FERC uses to assess rate proposals are found in 15 U.S.C. § 717c(a)-(b):

(a) Just and reasonable rates and charges

another petition for review on March 12, 1998. These cases were consolidated along with a third, *City of Clarksville v. FERC,* No. 98-1099 (D.C.Cir. filed Mar. 16, 1998), later severed. *See Process Gas Consumers Group v. FERC,* No. 98-1075 (D.C.Cir. Apr.29, 1998). Petitioners argue that FERC violated the APA by failing to adequately support its decisions to approve (1) the twenty-year cap and (2) Tennessee's use of the NPV method for evaluating meter amendment requests. They argue further that Tennessee did not provide adequate notice under 15 U.S.C. § 717c(d) that its proposal affected meter amendment requests.

### A. The Twenty-Year Cap

The natural gas transportation industry is a natural monopoly; pipelines maintain an economically powerful position in relation to their customers. *See, e.g., UDC,* 88 F.3d at 1122. Congress sought to address this problem in 1938 by enacting the Natural Gas Act, ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. §§ 717–717(w)) ("NGA"), the "primary aim" of which is "to protect consumers against exploitation at the hands of natural gas companies." *Federal Power Com'n v. Hope Natural Gas Co.,* 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *see also Public Sys. v. FERC,* 606 F.2d 973, 979 n. 27 (D.C.Cir.1979) ("control of the economic power of utilities that enjoy monopoly status" is the focus of regulation under the NGA and the Federal Power Act). In exercising the authority granted by the NGA to review rate changes proposed by pipelines, FERC must remain attuned to the status of the affected market vis-a-vis monopoly and competition.[10]

> All rates and charges made, demanded, received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

If the market is not a monopolistic one, market-based prices are presumed to be proper. *See Elizabethtown Gas Co. v. FERC,* 10 F.3d 866, 870 (D.C.Cir.1993) ("when there is a competitive market the FERC may rely upon market-based prices ... to assure a 'just and reasonable' result"). If the market is dominated by one or a few companies, FERC uses devices such as a rate ceiling that compensate for the imbalance in market power. This same concern is present as well when FERC looks at pipeline-shipper contract terms other than price. *See UDC,* 88 F.3d at 1140 (increased contract length can be a surrogate for bidding over the maximum approved rate); *Tejas Power Corp. v. FERC,* 908 F.2d 998, 1004 (D.C.Cir.1990) ("[i]n a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable"); *Tennessee Gas II,* 79 F.E.R.C. at 62,342 ("both the Commission and the courts carefully scrutinize use of [length of term] and place limits on it to be sure that there is not undue exercise of monopoly power").

In this case FERC acknowledges that the market served by Tennessee's pipeline has monopolistic characteristics. *See Tennessee Gas III,* 82 F.E.R.C. at 61,026; *Tennessee Gas II,* 79 F.E.R.C. at 62,339 n. 11. The question for us then is whether FERC has adequately justified its conclusion that a twenty-year cap will function to assure that the NPV method of awarding available capacity is "just and reasonable." 15 U.S.C. § 717c(a). That is, whether it will prevent the NPV method from compelling shippers to offer the pipeline longer contracts than they would in a competitive market. We have recognized that a cap is "necessarily [a] somewhat arbitrary figure," but that acknowledgment does not

free FERC of its obligation to "provide[ ] substantial evidence to support its choice and respond[ ] to substantial criticisms of that figure." *UDC,* 88 F.3d at 1141 n. 45. Reasoned decision making, which we find absent here in several respects, remains a regulatory essential, even when the agency tools are rough ones.

As previously noted, FERC supported its approval of the twenty-year cap by pointing to three previous Commission decisions involving ten and fifteen year precedent agreements. Because every market for natural gas pipeline transportation does not suffer from monopoly conditions, *see Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines,* 74 F.E.R.C. ¶ 61,076 (1996), considering the range of negotiated firm transportation contract lengths can be a defensible way of determining the adequacy of a particular cap. Of course, when FERC approves a cap the contract data it relies on must support its decision. Here FERC's orders fall short by neglecting to explain why the existence of ten and fifteen year precedent agreements supports a twenty-year cap. Given these numbers, we might have expected FERC to refuse to allow Tennessee to use a cap of more than fifteen years, not twenty years; assuming that competitive market contracts typically run to no more than fifteen years, a twenty-year cap would allow Tennessee's market power to induce excessively long bids. We do not mean to say that a twenty-year cap can never be justified from these numbers, only that there must be some (rational) explanation of the link between the numbers and the cap. We see none here.

FERC must also explain its choice of a data set in the face of an objection. *See UDC,* 88 F.3d at 1141 (cap remanded in

(b) Undue preferences and unreasonable rates and charges prohibited
No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject.

any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

part because FERC looked at the lengths of contracts involving the construction of new pipeline facilities and then failed to respond to the objection that this was the wrong type of contract to consider). Petitioners called for the same five-year cap as the Commission selected on remand from *UDC* in Order No. 636–C for the right-of-first-refusal context, asking that the data relied on in that proceeding be used in the evaluation of Tennessee's cap. In that order, FERC went well beyond a cursory citation to a few contracts and reviewed data from pipelines' quarterly electronic filings. *See* Order No. 636–C, 78 F.E.R.C. at 61,773. It summarized the data as follows:

> For pre-Order No. 636 long-term contracts, the average term was approximately 15 years. The data show that since Order No. 636, pipelines have entered into substantially shorter contracts than before. Post–Order No. 636 long-term contracts had an average term of 9.2 years for transportation, and 9.7 years for storage. For all currently effective contracts (both pre- and post-Order No. 636), the average term is 10.3 years for transportation and 10 years for storage. Moreover, ... the trend toward shorter contracts is continuing. About one quarter to one third of contracts with a term of one year or greater, entered into since Order No. 636, have had terms of one to five years. However, nearly one half of such contracts entered into since January 1, 1995, have had terms of one to five years....

> The industry trend thus appears to be contract terms that are much shorter than twenty years.

*Id.* at 61,774 (footnotes omitted). In *Tennessee Gas II* and *III,* FERC rejected the proposition that this discussion in Order 636–C is relevant to the instant situation. It reasoned that the right-of-first-refusal process protects existing shippers as opposed to the present circumstances where Tennessee is conducting an open season for generally available capacity and there are no existing shippers that stand to lose

their capacity and thus require protection. This, however, seems to us a distinction without a difference. The NGA aims to protect all shippers and potential shippers from pipelines' excessive market power, not just existing shippers faced with an expiring contract. If the data relied on in Order No. 636–C is not relevant in this context, FERC has yet to tell us why.

Apart from these concerns, we find FERC's reasoning on the cap to be unpersuasive and largely conclusory. In the orders under review, FERC frequently refers to its goal of encouraging the allocation of pipeline capacity to parties willing to pay the most for it. *See, e.g., Tennessee Gas II,* 79 F.E.R.C. at 62,337 ("The Commission has previously discussed the desirability of the economic efficiency achieved by allocating capacity to parties who value it the most." (footnote omitted)). We do not quarrel with that goal, but remind FERC of its admitted need to balance the goal with its duty to prevent exploitation of Tennessee's monopoly power. FERC appears to have forgotten the latter in its focus on maximizing pipeline revenue:

> Under the instant proposal, market forces can determine the duration of service for the new, or newly available capacity within whatever cap Tennessee proposes for that particular transaction.
>
> ...
>
> [T]he primary issue here, is whether when two shippers both desire new capacity should that capacity go to a shipper who values it more, *i.e.,* for a longer term, than another shipper who might value it less.

*Id.* at 62,339.

> A 20-year cap is consistent with Commission policy of allowing those who value capacity the highest, including those who value longer-term contracts, to acquire the capacity.

*Tennessee Gas III,* 82 F.E.R.C. at 61,026 (footnote omitted). To the limited extent that FERC answered claims that the cap is too long given the market power problem, its statements appear to be disconnected and on occasion contradictory:

Bidders are not forced into the maximum duration which in any event is limited to no more than twenty years. Any longer or the consideration of unlimited periods of time would be allowing an unduly discriminatory exercise of monopoly power.

*Tennessee Gas II,* 79 F.E.R.C. at 62,339 & n. 11.

> The Commission does not find the application of the 20–year NPV criteria to be an application of monopoly power in and of itself.

*Tennessee Gas III,* 82 F.E.R.C. at 61,026. Once the Commission acknowledged that there is a monopoly problem, it was obligated to take the problem seriously and confront it with a forthright explanation of why a twenty-year cap would not augment that power. *Cf. Laclede Gas Co. v. FERC,* 997 F.2d 936, 947 (D.C.Cir.1993) (in determining whether to accept a proposed settlement, it is appropriate for FERC to consider the possibility of protracted litigation; however, it "must indicate why the interest in avoiding lengthy and difficult proceedings warrants acceptance of this particular settlement"). Instead, the orders seem to suggest that FERC approved the twenty-year cap because, functionally, twenty years would amount to no cap at all. This is hardly rational decision making.

B. *Meter Amendments*

■ As with the twenty-year cap, FERC's explanation for applying NPV to meter amendments emphasized the maximization of pipeline revenue. Once again, however, the Commission fell short in addressing an important countervailing concern—this time, the ability of existing shippers to change primary points. Throughout the administrative proceedings, petitioners stressed the importance of receipt and delivery point flexibility to shippers and their belief that, under NPV, much flexibility would be lost due to the inability of existing shippers seeking new meter points under changed market circumstances to outbid new shippers. Petitioners cited the example of a shipper whose original source of natural gas has dried up necessitating a change of a receipt point to a different supplier at a different location. The inability to switch points to meet such exigencies can cause disruptions not just for shippers, but for end users as well.

FERC's response was that, contrary to petitioners' claims, in many cases existing shippers actually can compete with new bidders for changed meter points on the basis of NPV. Despite the disadvantage faced by existing shippers stemming from the pipeline's focus on incremental revenue only, FERC suggested ways in which an existing shipper can generate a bid with a positive value: "If it is paying a discounted rate, it can increase the rate offered. It also can increase the amount of overall capacity requested or extend the zones its service covers."[11] *Tennessee Gas III,* 82 F.E.R.C. at 61,028 n. 17. But the petitioners make a good case that these options are largely illusory in the majority of cases. It is often impossible to offer a higher rate or to request more capacity because the only pipeline capacity that could be of any use to the existing customer is already spoken for. Extending zones is impossible for shippers using delivery points in the northernmost zone and receipt points in the southernmost and commercially infeasible for many other shippers. Even when an existing shipper can produce an NPV higher than zero, it is easier for a new shipper to go even higher than for an existing shipper. By improperly minimizing the difficulty that existing shippers will face in the NPV process when they request meter amendments, FERC failed to seriously address the problems that the use of NPV might cause for existing shippers.

FERC also suggested that shippers unable to obtain a point on a primary basis can use it on a secondary basis.[12] This

---

**11.** The pipeline is evidently divided into seven zones, numbers zero through six.

**12.** The NPV capacity allocation method does not affect secondary points.

secondary option has substantially diminished utility because it does not guarantee access to the point over any fixed period of time.

At the end of the day, though, FERC's position is that regardless of the ability of existing shippers to compete on the basis of NPV or to meet their needs by using secondary points, it is best to award primary point capacity on the basis of the amount of additional revenue generated for Tennessee. If existing shippers are injured, so be it. The orders under review suggest this bottom line and at oral argument FERC counsel appeared to endorse it. While awarding capacity to the party who will increase the pipeline's revenues the most is certainly one proper consideration in establishing a new price regime, we think it was unreasonable for FERC to ignore the serious potential problems for existing shippers highlighted by petitioners. Existing shippers entered into their contracts with Tennessee with an expectation of a certain amount of primary point flexibility. When the pipeline proposes to take away that flexibility altogether or reduce it substantially, FERC is obligated to provide a better explanation of why the shippers' resultant loss cannot be taken into account in a more balanced application of the NPV pricing system. This includes explaining why an alternative approach suggested by petitioners—crediting to a bid some portion of the payments already obligated instead of incremental revenue only—is not preferable to the approach FERC approved.

## C. Notice of Change in Meter Amendment Process

■ Petitioners also contend that Tennessee's initial filing failed to give adequate notice that NPV would be applied to requests for meter amendments. They say that they only realized Tennessee's intent when they read the pipeline's electronic bulletin board posting in the latter part of August 1996. The notice requirement is imposed by 15 U.S.C. § 717c(d):

> Unless the Commission otherwise orders, no change shall be made by any

natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.

FERC twice rejected the claim of inadequate notice. See Tennessee Gas III, 82 F.E.R.C. at 61,027; Tennessee Gas II, 79 F.E.R.C. at 62,337.

We agree with FERC that petitioners lack standing to raise this issue because they fail to satisfy standing's injury prong; the injury they allege is too speculative. See Office of the Consumers' Counsel v. FERC, 808 F.2d 125, 128–29 (D.C.Cir. 1987) (to have standing, a party seeking judicial review of a FERC order must allege a non-speculative harm). Petitioners assert that, "had Tennessee's customers received *prior* notice of the tariff change FERC ultimately approved, they might well have made changes to their primary receipt or delivery points before the tariff change took effect." Joint Reply Br. for Pet'rs at 20 (emphasis in original). "Might well have" sounds speculative, especially in this context. The method used by Tennessee to evaluate point change requests would seem to have little or no effect on the need or even desirability, from the standpoint of a shipper, of a point change. Thus, we expect that any point change request that "might well have" been made before the tariff change was implemented on August 1, 1996, would have been lodged before or after that date. Yet petitioners point to no such point change requests that were denied. If opportunities for meter amendments were actually missed, petitioners should have been able to cite them.

### III. CONCLUSION

The petitions for review are granted. We remand to the Commission to better explain or modify its approval of the twenty-year cap and of Tennessee's use of the NPV method of allocating pipeline capacity in the context of requests from existing shippers for meter amendments. We do not reach petitioners' notice claim for lack of standing.

