In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1840

Village of Bethany, Illinois, et al.,

Petitioners,

and

Amoco Production Co., et al.,

Intervenors-Petitioners,

v.

Federal Energy Regulatory Commission,

Respondent,

and

Natural Gas Pipeline Co. of America,

Intervenor-Respondent.

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

Argued April 18, 2001--Decided January 11, 2002


  Before Harlington Wood, Jr., Diane P. Wood,
and Williams, Circuit Judges.

  Diane P. Wood, Circuit Judge.  The
petitioners in this case are small
municipalities (to which we refer
collectively as the Municipalities) that
buy natural gas transportation services
from the Natural Gas Pipeline Company of
America (Natural). In 1997, Natural filed
tariffs with the Federal Energy
Regulatory Commission (the Commission)
proposing to change the way that it
allocates capacity that becomes available
on its pipeline. After several rounds of
negotiations and comments, the Commission
issued orders approving Natural's new
capacity allocation plan. The
Municipalities have filed a petition for
review of those orders, challenging two
aspects of the plan. Although we are not
unsympathetic to their concerns, we find
that those concerns should be addressed
during the Commission's next ratemaking

proceeding regarding Natural's pipeline and were not relevant to the Commission's decision in this capacity allocation case. We therefore enforce the Commission's orders.

# I

Much of our decision in this case turns on the distinction between two types of proceedings before the Commission. In a ratemaking proceeding, the Commission sets the maximum and minimum rates that a pipeline can charge its customers, essentially by determining the total cost of operation, adding a fair profit for the pipeline company, and then deciding on a fair allocation of the total costs among the pipeline's customers. The overriding policy concern in a ratemaking proceeding is to establish rates that require each customer to bear a fair and proportional share of the pipeline's costs. This case, however, does not involve ratemaking. Instead, this case involves the general terms and conditions under which Natural operates-- specifically, the procedure by which it allocates available capacity on its pipeline among its customers. As we shall see, theinterests and policy goals at issue in such a proceeding differ markedly from those involved in a ratemaking case.

# A

Before we proceed to the specific disputes before us, a bit of background on the basic concepts at issue is in order. First, a few of the issues that commonly arise in ratemaking cases are relevant here. Natural, like most other pipeline companies, sells the gas it transports to various types of customers, including industrial users, large intrastate gas companies, and the Municipalities, which in turn provide residential and small business gas service in their areas. The Municipalities are captive customers of Natural's pipeline because no other pipeline reaches their areas. Many of Natural's other customers, however, have a choice between using Natural and using competing suppliers. Because the customers' capacity needs vary widely and because some but not all of the customers are captive, determining each customer's fair share of the pipeline's fixed costs

can be difficult.

Since the 1980s, the Commission has had a general policy of encouraging competition among natural gas pipelines. In furtherance of this general goal, the Commission a decade ago undertook a rulemaking procedure that resulted in Order 636, which is its latest major policy statement on how it will set rates for interstate pipelines. See Order No. 636, FERC para. 30,939 (1992). Pipelines generally offer two basic types of service. First, pipelines sell "firm capacity," which represents a guarantee that a certain amount of gas will be available for the buyer. Second, pipelines sell interruptible service, which allows customers to buy additional gas as long as capacity is actually available on the pipeline, but does not guarantee capacity availability. In Order 636, the Commission determined that pipelines should price their services based on two-part rates, so that each customer would pay both a "reservation charge" based on the amount of firm capacity committed to the customer and a usage charge based on the actual amount of gas the customer consumed. The Commission believed this two-part structure would aid competition between pipelines, because it would reduce price distortions inherent in a one-part rate based only on consumption.

When the Commission issued Order 636, however, it realized that switching from one-part rates to two-part rates could shift some costs from large industrial users to smaller users. In general, users such as the Municipalities, which serve primarily residential customers, have a high seasonal variation between their peak demand and their average usage. Because these users need a firm capacity commitment that will cover their peak demand, they often are not using their entire firm capacity. Industrial users, on the other hand, tend to have fairly constant rates of usage, so that their average usage is much closer to their peak demand. In the industry, a customer's average usage divided by its peak demand is called that customer's "load factor." A low load factor indicates a wide disparity between average and peak usage, while a high load factor indicates a fairly constant rate of usage. Separating out reservation

(i.e. firm) charges from usage charges will generally increase the total bill for customers with low load factors and decrease the total bill for high-load-factor customers.

In order to mitigate this effect on small, low-load-factor consumers, the Commission in Order 636 allowed pipelines to continue using one-part rates for these customers. These one-part rates were calculated in a way that would incorporate both the customer's portion of the pipeline's fixed costs and the customer's actual usage into a single rate that would be applied to the volume of gas the customer consumed. The rates were not intended to reflect the exact amount the small customers would have paid under the two-part rates. Rather, in calculating the one-part rates, the pipelines and the Commission imputed to the small customers a load factor higher than their actual load factors. The combined effect of these adjustments was to charge the small customers a smaller percentage of the pipeline's fixed costs than they would have paid under the two-part rate. The Municipalities buy gas from Natural under one of these special one-part rates.

As we have noted, the ratemaking process results in a range of rates that a pipeline is allowed to charge. The important question in this case relates to the next stage of the process: how the pipelines determine the rate they will charge to individual customers. The rate schedules the Commission sets for a pipeline can vary according to geography, and most pipelines also have different rate schedules for different types of service or classes of customers. Each of these rate schedules incorporates a set minimum and maximum rate. Most pipelines are free to charge a customer any rate between the minimum and the maximum set for that customer's area and class of service, with the qualification that pipelines may not unduly discriminate between similarly situated customers. See 15 U.S.C. sec. 717c(b).

Despite the rule against unreasonable discrimination, pipelines are generally allowed to offer discount rates (below the maximum rate but above the minimum) to attract customers in competitive markets. See, e.g., 18 C.F.R. sec.

284.10(c)(5). The Commission believes that allowing discount rates is good for end-users in competitive markets, because it drives down prices, and that allowing discount rates is also good for all customers on a pipeline, even for those who are not in competitive markets, because discount rates can prevent the pipeline from losing business to other pipelines or to other types of energy. More business on the pipeline, the Commission reasons, means each customer pays a smaller percentage of the pipeline's fixed costs. For these reasons, the fact that one customer receives a discount to meet market competition while another customer, in a captive market, does not, is not necessarily considered "undue" discrimination between customers. See Associated Gas Distrib. v. FERC, 824 F.2d 981, 1009-12 (D.C. Cir. 1987). The Commission's discount policy is one of the key points of contention in this case.

B

With this background in mind, we turn to the function of the Commission that is more directly relevant in this case: the regulation of the process by which pipelines allocate their capacity. Pipelines have long-term contracts with many of their customers for firm capacity, and customers such as the Municipalities generally have the right to renew their firm capacity contracts indefinitely. When firm capacity contracts expire and are not renewed or when the pipeline expands its capacity, the pipeline has new firm capacity to allocate among its customers.

Until the 1990's, pipelines generally allocated available firm capacity on a first-come, first-serve basis. More recently, however, the Commission has turned to an auction system, under which pipelines are encouraged to auction available capacity in a way that limits their discretion while maximizing their total revenues. According to the Commission, the new system fosters efficiency by ensuring that the customer willing to pay the most for the firm capacity (within the allowable rates) is the one who receives it. This approach also benefits all users of the pipeline, because it ensures that customers who are

willing to take the largest chunks of available capacity receive that capacity. This reduces the system's unused capacity, which in turn allows the pipeline to spread its fixed costs among a larger customer base. Finally, awarding capacity to the highest bidder helps the other pipeline users, because if that bidder pays more toward fixed costs, the other users ultimately pay less. In this case, the Commission approved this type of auction system for Natural; the Municipalities challenge various aspects of that decision.

In 1997, Natural ran into trouble with the Commission for unfairly awarding available firm capacity to an affiliated company at discounted prices. As a result, the Commission required Natural to develop a new system for allocating firm capacity that would leave the pipeline with less discretion, and thus less opportunity to engage in undue discrimination. When Natural filed its new tariffs, it proposed, in keeping with the Commission's current policy, to switch to an auction method for allocating capacity. In auctioning capacity, Natural planned to use a "net present value" method to award capacity to the bidder who would produce the greatest total revenue for the pipeline. The net present value method takes into account only the reservation charge the customer would pay, not the anticipated usage charges. The Commission had approved this auction method for several other pipelines.

Natural also proposed that it would establish a system of reserve prices and that it would not be required to accept any bids below the reserve prices. The reserve prices would, of course, fall between the maximum and minimum allowable prices under Natural's current rate schedule. Natural believed that it needed to set different reserve prices in different regions, in different markets, and for different types of customers, because it needed to be able to take into account both differences in its costs of service and competition from other suppliers in setting the price at which it would sell to each customer. In most cases, the Commission allows pipelines to set an unlimited number of reserve prices for different customers, as long as the pipeline can justify the distinctions it

is making. Natural's case was different. Because it had a history of undue discrimination, the Commission wanted to impose more restraints on Natural's reserve prices. Natural proposed a system under which it would use a 15-market matrix to set different reserve prices for different markets that it identified, based on such factors as cost-to-serve and market competition.

Before the Commission, the Municipalities challenged Natural's proposal on a number of grounds; they renew two of those challenges here. First, they argued that basing the auction solely on reservation charges discriminates against small customers like themselves who pay a one-part rate, because their one-part rate does not include a reservation charge. These customers would be forced to bid at a two-part rate to compete with the other bidders. Forcing them into a two-part rate is wrong, they argued, because if small customers on Natural's system paid a two-part rate, they would be shouldering a disproportionate percentage of the pipeline's fixed costs and effectively subsidizing larger users. The Municipalities sought an evidentiary hearing in which they hoped to prove that the one-part rate on Natural's system accurately reflects their proportionate fixed costs. Second, the Municipalities challenged the reserve pricing proposal, arguing that it is unduly discriminatory for Natural to take factors other than cost-to-serve into account in setting its reserve prices.

The Commission rejected both of the Municipalities' challenges and approved Natural's proposal with some modifications not relevant here. The Commission approved the net present value auction system as consistent with itspolicy of awarding available capacity to the highest bidder. In so holding, the Commission denied the Municipalities' re quest for an evidentiary hearing, noting that it had recently approved almost identical auction systems on other pipelines and that the evidence that the Municipalities wanted to present was relevant only to ratemaking, not to capacity allocation. The Commission also determined that Natural's proposed reserve pricing system struck a good balance between allowing Natural the

flexibility to meet market competition and preventing Natural from unduly discriminating in favor of its affiliates.

After the Commission issued its final orders, the Municipalities filed this appeal. Since the time the appeal was filed, Natural has further modified its reserve price system, with the Commission's approval. The 15-market-matrix system the Commission originally approved turned out to be unworkable, and so the Commission permitted Natural to change to a system under which it may set an unlimited number of different reserve prices for different customers, but it must set and disclose the reserve prices before the bidding opens. Natural's current auction system still bases bids only on reservation charges, and Natural still has the ability to set different reserve prices on bids from customers whose cost-to-serve is identical.

II

Our review of the Commission's orders in this case is deferential. "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and therefore a presumption of validity attaches to each exercise of the Commission's expertise." Northern Indiana Pub. Serv. Co. v. FERC, 782 F.2d 730, 739 (7th Cir. 1986) ("NIPSCO"). Our review of the Commission's orders is therefore "narrow and circumscribed" and is "limited to assuring that [the decision] is reasoned, principled, and based upon substantial record evidence." Id. In conducting this limited review, we will consider "(1) whether the Commission abused or exceeded its authority, (2) whether each essential element of the Commission's order is supported by substantial evidence, and (3) whether the Commission has given reasoned consideration to each of the pertinent factors in balancing the needs of the industry with the relevant public interests." Peoples Gas Light & Coke Co. v. FERC, 742 F.2d 1109, 1111-12 (7th Cir. 1984). We find that the orders the Municipalities challenge satisfy these standards.

We begin our inquiry by considering the Municipalities' argument that a bidding system based only on reservation charges

impermissibly discriminates against small customers who pay one-part rates. Recall that under the bidding system the Commission approved in this case, Natural's customers compete for capacity on the pipeline on the basis of the "net present value" of their bids, and that net present value is determined with reference only to the reservation charges that the customer would pay on the capacity it seeks. Because a one-part rate has no specified reservation charge, a bid based on a one-part rate would result in a net present value of zero, and the small customer would always lose out to a larger customer bidding based on a two-part rate (which includes a reservation charge). The Municipalities might be able to win new capacity based on their one-part rates if there were no other bidders, but otherwise the Municipalities could only compete by agreeing to pay two-part rates for the new capacity.

The Commission concedes that small customers would not be able to compete at their one-part rates under the net present value bidding system, but argues that the system is consistent with the Commission's policy of using auctions to increase pipeline efficiency. In its orders in this case, the Commission noted that the one-part rate is a form of subsidy from the large users to the small users, in that the small users pay less under the one-part rate than they would under the two-part rate. The Commission went on to hold that, while there may be policy reasons supporting the use of the one-part rate for the Municipalities' current capacity, there is no policy reason the Commission should allow the Municipalities to grow at their subsidized rates, at the expense of larger customers who are willing to pay higher rates for the capacity. The Commission also noted that it has reached similar conclusions in two other recent cases, and relied on its decisions in those cases as evidence of its policy on this point. Tennessee Gas Pipeline Co., 79 FERC para. 61,297, 1997 WL 438901, remanded on other grounds, Process Gas Consumers Group v. FERC, 177 F.3d 995 (D.C. Cir. 1999); Texas Eastern Transmission, 80 FERC para. 61,270, 1997 WL 579011, aff'd sub nom. Municipal Defense Group v. FERC, 170 F.3d 197 (D.C. Cir. 1999).

A

The Municipalities argue that the Commission erred in treating this issue as a policy question rather than as a factual question. They are confident that they could have proven that, on Natural's system, the one-part rate is not a "subsidy," because it accurately reflects the small customers' proportionate share of the pipeline's fixed costs. The corollary of their argument is that, if they are forced to bid for new capacity at two-part rates, they will be forced to shoulder more than their fair share of the pipeline's fixed costs for that capacity. The Municipalities ask us toremand for an evidentiary hearing, at which they would seek to prove that the one-part rate is not a subsidy on Natural's system.

After reviewing the Municipalities' recitation of the facts they propose to prove at an evidentiary hearing, however, we agree with the Commission that a hearing was unnecessary. The Municipalities quarrel vigorously with the Commission's characterization of the rate as a "subsidy." Regrettably, however, the parties are talking past each other, because they attach different meanings to the term "subsidy." The Municipalities want to prove that, even under their one-part rates, they are still shouldering their full proportional share of the pipeline's fixed costs. They cite several cases in which they say they have proved this factual point in the past. See NIPSCO, 782 F.2d at 741–42; Natural Gas Pipeline Co. of Am., 68 FERC para. 61,388, 62,559, 1994 WL 613238. While we express no opinion as to what factual conclusions the courts actually reached in these cases, we note that if the facts the Municipalities have alleged would have affected the issues the Commission was considering in those proceedings, then the Commission should have afforded the Municipalities an evidentiary hearing. The preliminary question here is suggested by this analysis: were the facts the Municipalities proffered relevant to the Commission's deliberations? The answer is no. When the Commission said in its orders that theMunicipalities' one-part rate was a "subsidy," all it meant was that the one-part rate results in a lower total bill for the same combination of

firm capacity and usage than a two-part rate would. The Municipalities do not dispute this point; in fact, they concede as much in their reply brief. As this was the only relevant fact on which the Commission relied in reaching its decision, there was no need for an evidentiary hearing.

We also agree with the Commission's decision to focus only on whether the one-part rate allowed the Municipalities to pay less than they would under a two-part rate, rather than on whether the one-part rate covered their full pro rata share of the pipeline's costs. The reason this focus was correct turns on the distinction between the policy objectives in a ratemaking case and the objectives in a capacity auction. At the ratemaking stage, the Commission is trying to allocate the costs of operating the pipeline fairly among the pipeline's customers. In that context, knowing whether the one-part rate is an accurate measure of the small customers' fair share of the costs, or whether it falls below their fair share, is critical. The Commission's stated goals for capacity auctions are different. In capacity auctions, the Commission wants to increase the overall efficiency of the pipeline by increasing the pipeline's total revenues and minimizing the unsubscribed capacity. See Tennessee Gas, 1996 WL 432428, at *8. Both of these goals benefit all the pipeline's customers because they give the pipeline a larger base among which to spread fixed costs. In addition, the capacity auction should ensure that the customers who most value additional capacity (presumably, the ones willing to pay the most for it) are the ones who get that capacity. See Texas Eastern, 1997 WL 432665, at *3. In the capacity auction context, the relevant question is not what a fair allocation of fixed costs is, but which customers are willing to pay the most to win any additional capacity. Assuming the Commission's policy objectives in the capacity auction context are reasonable, it was entirely appropriate for it to reject a two-tiered bidding system that would have allowed the Municipalities to win capacity even when they were not willing to pay as much as other bidders.

B

This conclusion leads us to the Municipalities' next contention, which is that the Commission's general policy in favor of net present value capacity allocation is unreasonable. As the Municipalities point out, the Commission's policy favoring the net present value system appears only in cases such as Texas Eastern and Tennessee Gas, not in any formal policy document, and it has never been the subject of notice-and-comment rulemaking. Because the policy was not subjected to formal rulemaking and we see no reason to assume that Congress intended policies announced in the Commission's individual case decisions to have the force of law, the policy is not entitled to deference in this court under the principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See United States v. Mead Corp., 121 S. Ct. 2164, 2172-73 (2001). Nevertheless, as the reasoned judgment of the federal agency charged with administering our national energy policy, the Commission's view does "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Id. at 2171, quoting Skidmore v. Swift, 323 U.S. 134, 139-40 (1944). We will uphold the Commission's policy choice if it appears that the Commission has "given reasoned consideration to each of the pertinent factors in balancing the needs of the industry with the relevant public interests." NIPSCO, 782 F.2d at 739.

In this case, the Commission's chosen policy meets this test. From an economic standpoint, the Commission's preference for allocating available capacity to the bidder willing to pay the most for it is sound. It has the effect of allocating resources to those who most value them, and it results in lower fixed-cost charges to everyone else on the pipeline. The net present value approach is consistent with these goals. It is true that the auction approach makes it harder for small customers to expand their firm capacity at their special one-part rates, but that is not enough by itself to reject the Commission's order. The Commission itself recognized this burden in its orders in this case, as it has in previous cases in which it has approved the net present value system. Balancing that hardship to the small customers

against the efficiency interests of the remaining customers, the Commission determined that the small customers were adequately protected by being able to continue to pay one-part rates on their existing capacity. Allowing the small customers to compete for new capacity on the basis of their one-part rates, the Commission found, would be unfair to the other pipeline users, who would be better served if the new capacity was allocated to a customer willing to pay a higher rate. In reaching this conclusion, the Commission considered the relevant factors and made a policy determination that balanced the competing interests before it. The District of Columbia Circuit recently approved the Commission's net present value policy as a reasonable exercise of its expertise, see Municipal Defense Group v. FERC, 170 F.3d 197, 201-03 (D.C. Cir. 1999), and we agree with our sister circuit's conclusion on that point.

III

We turn finally to the Municipalities' second major objection to Natural's capacity allocation scheme, which is that the reserve pricing system permits the pipeline unduly to discriminate against captive customers. Under the bidding system that the Commission approved, as we explained above, Natural sets reserve prices for each potential bidder before accepting bids. It is not required to allocate capacity at bids below the reserve prices. Natural is permitted to vary its reserve prices on any rational basis, including to meet the demands of market competition. The Municipalities contend that Natural should be permitted to vary its reserve prices only to reflect differences in the cost of providing service to each customer. Any other variation in pricing, they argue, violates the principle that the rates set for a regulated commodity should track the costs to provide the commodity to each consumer as closely as practicable.

A

Before we reach the merits of this contention, we must consider the Commission's argument that the Municipalities lack standing to pursue this claim. Under the Natural Gas Act, a party has standing to seek review of any

order of the Commission if it is "aggrieved" by that order. 15 U.S.C. sec. 717r(b). According to the Commission, the Municipalities' opposition to the reserve pricing system revolves around the Commission's decision to accept Natural's 15-market-matrix proposal. Because that system is no longer in use, the Commission reasons, the Municipalities cannot show that they are still aggrieved by it. The Municipalities respond that their quarrel is not with the 15-market-matrix proposal in particular, but with any system that allows Natural to vary its reserve prices in response to market competition rather than purely in response to cost differentials. This is a fair characterization of their argument, and, as so understood, it is clear that the Municipalities are at least as aggrieved by the current system, which allows Natural to set an unlimited number of different reserve prices, as they were by the 15-market-matrix system. Moreover, as long as the Commission allows Natural to vary its reserve prices based on market competition, it is reasonable to expect that captive customers such as the Municipalities will face higher reserve prices than will customers in more competitive markets. The Municipalities are aggrieved by the Commission's order and have standing to bring this claim.

B

We therefore proceed to the merits of the argument that it is unreasonable to allow Natural to vary its reserve prices in response to market forces. The reserve pricing system that the Commission approved allows Natural the flexibility to offer discounts to certain customers, within the range of allowable maximum and minimum rates, to meet market competition. The Municipalities' objection to this system can be understood in two ways. First, broadly, they contend that any system of market-based discounts violates the Natural Gas Act's prohibition on "undue preferences." See 15 U.S.C. sec. 717c(b). Second, they argue that, even if market-based discounts are appropriate in some cases, this is not one of them. Under Natural's system, it is unduly discriminatory to saddle the Municipalities (or perhaps all of Natural's captive customers) with the additional costs associated with providing discounts to customers in

Natural's competitive markets. The broader of these two arguments is foreclosed by a long line of precedent and the narrower one, which may well have merit in the context of Natural's next ratemaking case, is not relevant in the context of this capacity allocation case.

The Commission has long allowed market-based discounts, on the theory that the discounts stimulate competition, reduce prices for consumers in competitive markets, and increase the pipeline's total customer base, which helps lower prices to both non-captive and captive customers. This general principle was part of the Commission's Order 436, which was the last major rulemaking on rate design before Order 636. In 1987, the District of Columbia Circuit gave extensive consideration to the Commission's general policy allowing market-based discounting and concluded that the policy was reasonable and did not sanction undue discrimination. See Associated Gas Distrib. v. FERC, 824 F.2d 981, 1009-12 (D.C. Cir. 1987). The Associated Gas decision discusses with approval the Commission's policy grounds for allowing market-based discounts and notes that market-based discounting has long been allowed in regulated industries. Id. at 1011. In Order 636, the Commission again approved its policy of market-based discounts, and the concept is embodied in the Commission's regulations. See 18 C.F.R. sec. 284.10(c)(5) (entitled "Rate flexibility" and stating that, as long as pipelines do not discriminate in favor of affiliated entities, "the pipeline may charge an individual customer any rate that is neither greater than the maximum rate nor less than the minimum rate on file"). Thus, the general concept of market-based discounts is firmly embedded in the Commission's official policies and has been approved by the courts. We have no inclination to reconsider the policy at this point.

The Municipalities' more narrow challenge to Natural's reserve pricing system is that, whatever the general status of market-based discounts, such discounts would unfairly shift costs to the captive customers on Natural's system. They correctly note that the Associated Gas decision did not sanction any and all market-based discounts, but

instead held that the Commission had to evaluate the specific discount schemes set up by each pipeline to ensure that captive customers were not forced to bear a disproportionate share of the pipeline's costs. Associated Gas, 824 F.2d at 1011-12. The Commission should permit pipelines to shift the costs of a discount to their captive customers if, but only if, the pipeline can show that the discount benefits the captive customers by enlarging the pipeline's total customer base. Id. The Municipalities argue that Natural cannot show that this is the case on its system, so it should not be allowed to offer market-based discounts.

The Municipalities are correct that the Commission has never specifically adjudicated whether the discounts Natural offers in its competitive markets actually benefit its captive customers. Nonetheless, this capacity allocation proceeding is not the proper place to raise the issue. The Municipalities, as captive customers on Natural's pipeline, are already paying the maximum rate Natural is permitted to charge under its current rate schedules (although they are paying under the lower one-part rates rather than the higher two-part rates). In the short term, discounts Natural offers to other customers will not affect the rates the Municipalities are paying for existing service, because their rates cannot be raised until Natural's next ratemaking case. If Natural offers discounts before its next ratemaking case, Natural may well argue at that time that the discounts have benefits for the captive customers. Natural might even be able to raise its maximum rates for those customers to recoup some or all of the cost of offering the discounts. At that stage, Natural will have to show that the benefits to the captive customers are real, and the Municipalities will have an opportunity to argue that the discounts do not benefit them. If the Municipalities are successful, Natural will not be allowed to raise the rates it charges captive customers. Instead, the pipeline will be forced to swallow any losses it is suffering from the offered discounts, and the Municipalities' rates will be unaffected. The question whether Natural's discount scheme benefits its captive customers can therefore be adequately addressed in Natural's next

ratemaking case, and the Municipalities'
attempt to litigate the issue here is
premature.

   For the foregoing reasons, we Enforce the
Commission's orders.