# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 24, 2014          Decided April 24, 2015

No. 13-1219

MYERSVILLE CITIZENS FOR A RURAL COMMUNITY, INC., ET
AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

DOMINION TRANSMISSION, INC.,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Carolyn Elefant* argued the cause and filed the briefs for
petitioners.

*Karin L. Larson*, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With her on
the brief were *David L. Morenoff*, Acting General Counsel,
and *Robert H. Solomon*, Solicitor.

*Catherine E. Stetson* argued the cause for intervenor. On
the brief were *J. Patrick Nevins*, *Christopher T. Handman*,
and *Sean Marotta*.

Before:  TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  Citizens of the small town of Myersville, in Frederick County, Maryland, oppose the construction of a natural gas facility called a compressor station in their town.  The compressor station is a small part of a larger expansion of natural gas facilities in the northeastern United States proposed by Dominion Transmission, Inc., a regional natural gas company and Intervenor in this case.  Dominion, which is in the business of storing and transporting natural gas, requested approval from the Federal Energy Regulatory Commission to move ahead with the project.  The Commission, over the objections of the Myersville citizens, conditionally approved it in December 2012.  Dominion then fulfilled the Commission's conditions, including obtaining a Clean Air Act permit from the Maryland Department of the Environment.  Dominion built the station, and it has been operating for approximately six months.

The Myersville citizens petition this court to vacate the Commission's order approving the project.  They attack the Commission's decision on a number of fronts.  They argue that the Commission lacked substantial evidence to conclude that there was a public need for the project Dominion proposed.  They assert that the Commission unlawfully interfered with Maryland's rights under the Clean Air Act.  They challenge the Commission's environmental review of the project, including its consideration of potential alternatives.  And they claim the Commission unlawfully withheld hydraulic flow diagrams from them in violation of their due process rights.  Because we conclude that each of

Petitioners' challenges lacks merit, we deny the petition for review.

**I.**

Dominion runs underground natural gas storage and transportation facilities in six northeastern and mid-Atlantic states. Dominion operates over 947 billion cubic feet of storage capacity and approximately 11,000 miles of natural gas pipeline. Before it sought the Commission's approval, Dominion conducted an "open season" in which it offered contracts for future supply of natural gas to potential customers. It entered contracts with two municipal utilities and a natural gas distribution company for firm transportation and storage services.[1] Dominion's proposed project, called the "Allegheny Storage Project," called for new or expanded natural gas facilities in Maryland, Ohio, West Virginia, and Pennsylvania, thereby providing to Dominion's customers an additional 115,000 dekatherms per day of firm transportation, 7.5 billion cubic feet of storage capacity, and 125,000 dekatherms per day of storage withdrawal at an estimated cost of over $112 million.[2]

The Project required the building of two compressor stations—facilities along a pipeline that compress gas to move it through the system at high speeds—and additional pipeline to serve the compressors. One of those compressor stations is

---

[1] "Firm" transportation service, as opposed to "interruptible" service, means the delivery of natural gas is guaranteed regardless of the proportion of the pipeline's capacity that is in use. *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1123 n.10 (D.C. Cir. 1996).

[2] A dekatherm is a unit of heat equal to one million British Thermal Units, or over one billion joules.

located on a twenty-one-acre plot in the town of Myersville. That compressor station is the subject of this appeal.

Congress enacted the Natural Gas Act, ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 *et seq.*), with the "principal purpose" of "encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices," *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976). "[S]ubsidiary" purposes include respecting "conservation, environmental, and antitrust" limitations. *Id.* at 670 & n.6. The Act vests the Commission with authority to regulate the transportation and sale of natural gas in interstate commerce, including authority to issue certificates permitting the construction or extension of natural gas transportation facilities, such as those Dominion operates. 15 U.S.C. § 717f(c).

Before any applicant may construct or extend natural gas transportation facilities, it must obtain a "certificate of public convenience and necessity" from the Commission pursuant to Section 7(c) of the Act. *Id.* § 717f(c)(1)(A). The Commission may issue a certificate to "any qualified applicant" if it finds that "the applicant is able and willing properly to do the acts and to perform the service proposed . . . and that the proposed service" and "construction . . . is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). As part of its certificate authority, the Commission has the "power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." *Id.*

Petitioners in this case—Myersville Citizens for a Rural Community, Inc. and citizens of Myersville Franz Gerner, Ted Cady, and Tammy Mangan—protest the building of the

Myersville compressor station. During the public comment process before the Commission, they raised objections, several of which form the basis of the current petition.

After preparing an Environmental Assessment of the Allegheny Storage Project, the Commission rejected the objections made by Petitioners and others and granted Dominion a conditional Section 7 certificate. *Dominion Transmission, Inc.*, 141 FERC ¶ 61,240 (Dec. 20, 2012) ("*Certificate Order*"). The Commission conditioned the certificate, in part, on Dominion's ability to secure all necessary federal authorizations, including Clean Air Act permits. *Certificate Order*, App. B, Envtl. Condition 8. After considering renewed objections, the Commission denied rehearing. *Dominion Transmission, Inc.*, 143 FERC ¶ 61,148 (May 16, 2013) ("*Rehearing Order*"). The Myersville compressor station was placed into service on November 1, 2014. FERC, Docket No. CP12-72, *Supplemental Information Filing Replacing Previous filed In Service Notification Request of Dominion Transmission, Inc. under CP12-72* (filed Nov. 10, 2014). Petitioners timely petitioned for review of the Commission's orders.

\*\*\*

We have jurisdiction pursuant to 15 U.S.C. § 717r(b). Our review of the Commission's decision is limited to determining whether the order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 105-06 (D.C. Cir. 2014). "If supported by substantial evidence, the Commission's findings of fact are conclusive." *B&J Oil & Gas v. FERC*, 353 F.3d 71, 76 (D.C. Cir. 2004) (citing 15 U.S.C. § 717r(b)). We must assure ourselves that the Commission's "decisionmaking

is reasoned, principled, and based upon the record." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) (internal quotation marks omitted). In so doing, we consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1083 (D.C. Cir. 2002). Because the grant or denial of a Section 7 certificate of public convenience and necessity is a matter "peculiarly within the discretion of the Commission," *Okla. Natural Gas Co. v. Fed. Power Comm'n*, 257 F.2d 634, 639 (D.C. Cir. 1958), this court does not "substitute its judgment for that of the Commission," *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004). Moreover, "[w]hen considering FERC's evaluation of 'scientific data within its technical expertise,' we afford FERC 'an extreme degree of deference.'" *Washington Gas Light Co. v. FERC*, 532 F.3d 928, 930 (D.C. Cir. 2008) (quoting *Nat'l Comm. for the New River, Inc.*, 373 F.3d at 1327).

## II.

Petitioners challenge the Commission's finding of public need for the Project as unsupported by substantial evidence. They fault the Commission for approving the Project without requiring Dominion to submit its revised agreements with the new natural gas customers that subscribed to the added capacity. They contend that the absence of current gas contracts in the record undermines the Commission's finding that there is a public need for the Project adequate to ensure that pre-existing customers will not subsidize it. They also claim that the Project will result in an expansion of natural gas storage and transportation capacity beyond what Dominion disclosed to the Commission.

The Commission has outlined in a policy statement the criteria it considers in determining whether a proposed facility will receive a certificate of public convenience and necessity. *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000). The "threshold" question the Commission considers is "whether the project can proceed without subsidies from [the applicant's] existing customers." 88 FERC at 61,745. To ensure that a project will not be subsidized by existing customers, the applicant must show that there is market need for the project. The project must "stand on its own financially" through investment by the applicant and support from new customers subscribed to the expanded capacity through "preconstruction contracts." *Id.* at 61,746; *see also* 90 FERC at 61,392.

Provided a project will not be subsidized by existing customers, the Commission then balances the "public benefits against the potential adverse consequences" of the proposal. 88 FERC at 61,745. If no adverse effects would stem from the project, no balancing is required, and the Commission proceeds to environmental review. Otherwise, the Commission balances the adverse effects with the public benefits of the project, as measured by an "economic test." *Id.* Adverse effects may include increased rates for pre-existing customers, degradation in service, unfair competition, or negative impact on the environment or landowners' property. *Id.* at 61,747-48. Public benefits may include "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives." *Id.* at 61,748.

Applying those criteria, the Commission found that the Project would not be subsidized by existing customers and that the "minimal" adverse effects were outweighed by the public benefits. *Certificate Order* ¶ 21. In finding a public need for the project, the Commission found that "[a]ll of the proposed capacity has been subscribed under long-term contracts, demonstrating the existence of a market for the project." *Id.* The Commission concluded that the Project would ensure "the ability of two local distribution companies [Washington Gas Light Co. and Baltimore Gas & Electric] to meet the needs of their overall 1.5 million customers during periods of peak demand (i.e., the winter heating season)," providing "sufficient justification to authorize the construction and operation" of the Project. *Id.* ¶ 66.

We review the Commission's factual findings to ensure they are supported by "substantial evidence," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698, 704 (D.C. Cir. 2010) (internal quotation marks omitted); *see also* 15 U.S.C. § 717r(b). The standard "'requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence.'" *Minisink*, 762 F.3d at 108 (quoting *FPL Energy Me. Hydro LLC v. FERC,* 287 F.3d 1151, 1160 (D.C. Cir. 2002)).

**A.**

We first address the Commission's finding that the Project was supported by market need.

Dominion secured precedent agreements with three natural gas customers through the "open season" it conducted in the summer of 2007 for what was then called the "Storage Factory Project." *Certificate Order* ¶ 10. A precedent agreement is a long-term contract subscribing to expanded

natural gas capacity. *See, e.g.*, *Process Gas Consumers Grp. v. FERC*, 177 F.3d 995, 1000 (D.C. Cir. 1999). Technical issues led Dominion to abandon the Storage Factory Project in November 2008. *Certificate Order* ¶ 10 n.8. It revised and renamed the project the Allegheny Storage Project. *Id.* Dominion stated in its application that its precedent agreements were revised to reflect the changes, and that the Allegheny Storage Project was designed "to meet the needs of the prospective Storage Factory Project customers." *Id.* Dominion did not submit those revised precedent agreements to the Commission. Instead, it provided a summary of relevant terms of the original agreements and the affidavit of Dominion's Director of Gas Business Development stating that the Allegheny Storage Project customers had executed "binding precedent agreements representing 100% market commitment" for fifteen years for the expanded capacity. J.A. 96-98.

Petitioners argue that the Commission's finding of market need was unsupported by substantial evidence because Dominion did not submit the revised precedent agreements themselves for the record. To the extent that Petitioners argue the Commission is legally required to include in the record the most current version of precedent agreements in order to find that a project is supported by market need, that argument was not preserved for appeal. *See* 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). Petitioners did not argue before the Commission that it lacks the authority to find public need unless the most current precedent agreements, as distinct from other evidence of demand, are in the administrative record. The closest they came was in a request for rehearing, where, in a footnote, they

stated: "It should be noted that there do[ ] not appear to be even sample or generic precedent agreements available in the public record." J.A. 467 n.20. That did not adequately raise the issue, and, in any case, we need not consider arguments "tucked away in a footnote" in a request for rehearing. *North Carolina v. FERC*, 112 F.3d 1175, 1192 (D.C. Cir. 1997); *see also Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997).

Petitioners nonetheless preserved the more case-specific version of the argument: that the absence of the updated precedent agreements from this particular administrative record rendered the Commission's factual finding that the Project was fully subscribed unsupported by substantial evidence. Petitioners argued on rehearing that the agreements were "out of date" and that they "relate to a completely different project so at best, they demonstrate only a need for the Storage Factory Project, not for the [Allegheny Storage Project]." J.A. 467. In denying rehearing, the Commission addressed and rejected that argument. *See Rehearing Order* ¶ 30 n.29. It was therefore preserved for review.

Petitioners' challenge to the Commission's finding of market need fails on the record even in the absence of the updated precedent agreements. In addition to the sworn affidavit stating that the Project was fully subscribed, the Commission had before it motions to intervene filed by the two customers subscribed to the new natural gas transportation service and the bulk of the storage service. J.A. 123, 571. Both customers restated the amount of added capacity expected from the Project and identified themselves as the customers of that added capacity. While they did not identify how it would be allocated between them, Dominion's customers nevertheless made clear under oath that they had subscribed to the capacity Dominion proposed to add to its

natural gas infrastructure. Consistent with its *Certificate Policy Statement*, and based on the evidence before it, the Commission concluded that Dominion had adequately demonstrated market need. Applying our standard of review, in light of the facts taken together, we conclude that the Commission's finding was supported by substantial evidence, despite the absence of more specifics on the revised precedent agreements.

Contrary to Petitioners' assertion, this case therefore does not resemble *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d 659, 664 (D.C. Cir. 1996), where we held that the agency could not rely on a report outside the record in defending its factual findings, nor does it present a lack of evidence or reasoned findings such as was at issue in *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378 (1959). The Commission here does not attempt to rely on non-record evidence, nor did it lack sufficient evidence; instead, it argues that the affidavit and motions to intervene constituted substantial evidence to conclude that the Project was fully subscribed pursuant to precedent agreements. We agree.

Even assuming the precedent agreements were executed and the Project is fully subscribed, Petitioners urge us to consider a market study showing declining demand for natural gas as evidence of insufficient market demand. The Commission considered that same study, but found that it did not warrant a finding of lack of public need for two reasons. First, for a variety of reasons related to the nature of the market, "it is Commission policy to not look behind precedent or service agreements to make judgments about the needs of individual shippers." *Certificate Order* ¶ 66. In keeping with its policy, the Commission concluded that the evidence that the Project was fully subscribed was adequate to support the finding of market need. *Rehearing Order* ¶ 30. It is the case

here, as it was in *Minisink*, that "Petitioners identify nothing in the policy statement or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers." 762 F.3d at 111 n.10.

Second, even if the market study were relevant, the Commission found it unpersuasive because the study "provide[s] general overviews of demand by sector (that is, residential vs. industrial consumption), as well as general overviews of domestic inventories which are tied to weather extremes. The studies do not demonstrate that there is a decline in demand for natural gas in the markets which the Allegheny Storage Project is intended to serve." *Rehearing Order* ¶ 31. The petition does not respond to the Commission's analysis. We therefore see no reason to disturb the Commission's well reasoned finding.

**B.**

Petitioners also attack the Project as unsupported by market need because, in their view, there is evidence that Dominion designed the Project to add capacity to its natural gas infrastructure beyond the amount disclosed in its application—that is, that the Project would be "overbuilt." Even assuming that the precedent agreements were executed by Dominion's customers, Petitioners argue, the Project as proposed would produce excess capacity.

To "[o]verbuild" an energy project means to "build capacity for which there is not a demonstrated market need." 90 FERC at 61,391. Petitioners have no clear evidence that the Project is overbuilt, but they believe there are grounds to infer that Dominion's Myersville compressor station is larger and more powerful than it needs to be. In particular, they

argue that the 16,000 horsepower Myersville compressor station is more powerful than the 14,000 horsepower Middletown station originally proposed in connection with the Storage Factory Project—Dominion's predecessor to the Allegheny Storage Project—and therefore is meant to provide more service than originally proposed. Petitioners provide no evidence beyond the difference in horsepower to substantiate that claim, and they do not explain how the size and power of a compressor station relates to the total capacity added to the natural gas network.

As is evident from the structure of the natural gas system and the purpose of a compressor, a difference in horsepower does not necessarily mean a difference in storage and transportation capacity. A compressor station "'boost[s] the system pressure' along pipelines in order to 'maintain required flow rates.'" *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 241 (D.C. Cir. 2013) (alterations in original) (citing FERC, An Interstate Natural Gas Facility On My Land? What Do I Need To Know? 22 (2010)). Simply put, gas in a pipeline requires compression, or pressure, to keep it moving at desired rates. Given the capacity added by the Allegheny Storage Project to its pipeline network, Dominion identified a twelve-mile corridor between a compressor station in Chambersburg, Pennsylvania and another in Leesburg, Virginia where a new compressor station would have to be sited in order to maintain adequate natural gas pressure. J.A. 236. The Commission "independently analyzed the hydraulic corridor and [Dominion's] associated assumptions and determined that they were accurate for the 12-mile range." *Id.*

Myersville falls along that twelve-mile corridor, as did several possible alternative sites the Commission considered in its Environmental Assessment, including some other sites

in Myersville. One of the alternatives was the site proposed in the Storage Factory Project for a compressor station in nearby Middletown, Maryland. The Commission's Environmental Assessment demonstrates the many differences between the two proposed sites, including that the Middletown station would need a 14,000 horsepower compressor to maintain adequate pressure, whereas the Myersville station would need a 16,000 horsepower compressor due to its different placement. J.A. 237.

Petitioners seek to compare the two compressors in a vacuum, without regard to their different geographic placements and other changes necessitated by Dominion's overall shift from the original Storage Factory Project. The Myersville station is one of several interconnected facilities in a larger network, as was the proposed Middletown station. Petitioners have only pointed to the horsepower difference without explanation. The change in horsepower does not, however, provide a basis for this court to conclude that the Commission's finding that the station is not overbuilt was unsupported by substantial evidence. A change in one aspect of one facility as a result of the revision of the Project says nothing about the overall storage and transportation capacity the Project will add to Dominion's pipeline network. We see no basis upon which to overturn the Commission's finding.

Similarly, Petitioners' claim that "Dominion intends to use the facility for a purpose other than that stated in its application," i.e. "to export gas through Dominion's Cove Point liquefied natural gas (LNG) export facility in Calvert County, Maryland. Pet'rs' Br. 29-30. Petitioners' argument stems from their review of hydraulic flow diagrams filed confidentially with the Commission (and not in the record on appeal). They believe the flow diagrams demonstrate that natural gas that passes through Myersville will ultimately

make it to the Cove Point LNG Terminal. If that is the case, they claim, it undermines Dominion's application for a Section 7 certificate, which sought to expand domestic natural gas capacity, not add to Dominion's export capacity.

The Commission has repeatedly rejected Petitioners' argument that the Project was built, at least in part, to export natural gas through Cove Point, concluding that the Allegheny Storage Project "is not associated in any way with the Cove Point LNG Terminal or potential export authority at the terminal." *Rehearing Order* ¶ 33. First, in its *Certificate Order*, the Commission concluded that Petitioners' reading of the flow diagrams "overlooks the fact that Washington Gas [one of the customers of the Allegheny Storage Project] has numerous delivery points off the Dominion Cove Point Pipeline," which explains why the Cove Point Pipeline is associated with the Allegheny Storage Project. *Certificate Order* ¶ 161 n.109. It also noted that Petitioners' reading was inaccurate because it sought to "compare design day (contractual obligation) flow with non-coincidental peak deliveries; such comparisons are not valid." *Id.* In denying rehearing, the Commission further explained that

> [a]lthough a pipeline is constructed to meet contracted peak demands during periods of 100 percent load conditions, customers are not required to, and rarely do, use 100 percent of their contracted capacity every day of the year. This means that on any given day there may well be unutilized capacity in a pipeline. However, such capacity can be used to satisfy additional demand on an interruptible and short term firm basis.

*Rehearing Order* ¶ 32. Acknowledging that Dominion had recently filed an application to, "among other things,

construct, modify, own and operate certain facilities to enable the liquefaction of natural gas for export at its existing Cove Point LNG terminal," the Commission added that "Dominion Cove Point LNG's application does not indicate that the Myersville Compressor Station is needed to support the export of the liquefied natural gas." *Id.* ¶ 33 n.31.

The Commission's analysis is thorough and persuasive. In order to ensure adequate pressure during periods when all of the capacity required by the precedent agreements is being used, i.e., during periods of peak demand, a compressor station somewhere along the twelve-mile corridor that includes Myersville must be built. But, as Dominion explained at oral argument, natural gas molecules are not stamped with a destination when they enter an interstate pipeline. Oral Arg. Tr. 33. Nor can each molecule be traced from entry to exit. When the precedent agreement customers are not using their full capacity, and the compressor station is not working at full power, "there may well be unutilized capacity in a pipeline," which could "satisfy additional demand on an interruptible and short term firm basis." *Rehearing Order* ¶ 32. And because one of those customers, Washington Gas Light, has delivery points along a pipeline that ends at the Cove Point LNG terminal, when Washington Gas is not using full capacity, some gas that passes through Myersville may reach the Cove Point LNG Terminal. That does not imply that the compressor station is too large, because it says nothing about the horsepower needed to keep the system functioning when Dominion's customers use all of their contractually guaranteed capacity. Those realities associated with fluctuating customer demand and the pooled character of gas within the pipeline system do not vitiate the public need for the Project. Petitioners provide no response to the Commission's explanation of the flow diagrams, instead reiterating that the Commission has misread them.

Petitioners also point to what they perceive to be new evidence in support of their contention that the Project's capacity exceeds market need. After briefing in this case was completed, the Commission issued an order granting Dominion's separate Cove Point application. *Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244, 2014 WL 4854467 (Sept. 29, 2014). Petitioners submitted the Cove Point certificate order as supplemental authority for their argument that the Myersville compressor station is designed to help provide excess capacity to Cove Point for export, and hence, overbuilt. We disagree with Petitioners' inference from the Cove Point order because that order is entirely consistent with the two orders we review in this case.

After completion of the Cove Point LNG export project, the expansion or modification of existing compressor stations in Virginia, "together with the use of capacity from a terminated contract," will enable Dominion to transport up to 860,000 dekatherms per day of natural gas on a firm basis to the Cove Point terminal for export to customers it has already secured. *Id.* at *3. Commenters in that proceeding raised the question whether the Allegheny Storage Project will result in added capacity exported through Cove Point. The Commission reiterated the position it took in this case: The Allegheny Storage Project "significantly predated the Cove Point Liquefaction Project and is not in any way connected with it." *Id.* at *56. It repeated that Washington Gas has delivery points located on the Cove Point Pipeline, that the Myersville compressor station is required for periods of peak demand, and that the Commission's independent hydraulic analysis demonstrates that the two projects are separate and unrelated. *Id.* at *56-60. The Commission also acknowledged, as it did in this case, that during non-peak times, depending on a number of factors, Dominion "may be able to provide additional gas supplies, if nominated, to the

Dominion Cove Point Pipeline for liquefaction. This situation is no different than operating conditions on other Commission regulated pipeline facilities." *Id.* at *58.

In sum, Petitioners have not shown that the Commission was required to disapprove the Myersville compressor station on the ground that it would be overbuilt. Faced with Petitioners' challenge, we need only assure ourselves that the Commission's decision making is "reasoned, principled, and based upon the record." *Am. Gas Ass'n*, 593 F.3d at 19 (internal quotation marks omitted). We review the Commission's decision in light of its broad discretion in determining whether a particular project is supported by public convenience and necessity, *see Okla. Natural Gas Co.*, 257 F.2d at 639, and we must afford an "extreme degree of deference" to the Commission's scientific analysis, *Washington Gas Light*, 532 F.3d at 930 (internal quotation marks omitted). In light of the Commission's well supported and thoroughly reasoned finding that the Myersville compressor station appropriately responds to market need and is not overbuilt, and Petitioners' failure to adduce evidence convincingly contradicting that finding, we hold that the Commission's decision to issue a Section 7 certificate of public convenience and necessity was supported by substantial evidence.

### III.

The Natural Gas Act occupies the field of interstate natural gas transportation and sale, largely to the exclusion of state law. The Act confers on the Commission "exclusive jurisdiction" over transportation and sale, as well as over the rates and facilities of natural gas companies engaged in transportation and sale. *See, e.g.*, *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306-08 (1988); *N. Natural Gas*

*Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 821 (8th Cir. 2004); *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*, 894 F.2d 571, 576 (2d Cir. 1990). However, the Commission's power to preempt state and local law is circumscribed by the Natural Gas Act's savings clause, which saves from preemption the "rights of States" under the Clean Air Act and two other statutes.[3] 15 U.S.C. § 717b(d); *see also* 42 U.S.C. § 7401 *et seq.* (Clean Air Act). Petitioners argue that the Commission's issuance of a Section 7 certificate to Dominion conditioned on its subsequent receipt of an air quality permit under the Clean Air Act violated either provisions of the Natural Gas Act itself or provisions of the Clean Air Act that the Natural Gas Act's savings clause preserved.

The parties do not address the standard of review we should apply in evaluating the Commission's authority to issue the challenged certificate of public convenience and necessity. We have previously reviewed the Commission's interpretation of its authority to issue such a certificate by applying the two-step analytical framework of *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). *See Okla. Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994); *N. Natural Gas Co. v. FERC*, 827 F.2d 779, 784 (D.C. Cir. 1987). We find the Commission's interpretation not only reasonable but persuasive and hold that its certificate order did not violate the savings clause or any of the other statutory provisions Petitioners identified.

---

[3] The other two statutes are the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

**A.**

Dominion, as an intervenor in this proceeding, asserts that Petitioners lack "prudential standing" to argue that the Commission violated the Natural Gas Act's savings clause. Petitioners live in Myersville near the compressor station and claim they are affected by its construction and operation because of the effect it will have on their property values, its impact on the environment, the safety hazards they believe the facility poses, the noise it produces, and the aesthetic "eyesore" it presents. *See* Pet'rs' Br. 21-22 & add. 47-54. Dominion argues that Petitioners cannot complain about the Commission's encroachment on Maryland's Clean Air Act rights because they are not within the "zone of interests" of the savings clause they seek to enforce. We disagree.

The Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014), clarifies that "'prudential standing is a misnomer' as applied to the zone-of-interests analysis." *Id.* (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675-76 (D.C. Cir. 2013) (Silberman, J. concurring)). The zone of interests test simply "requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* "[W]e presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388 (internal quotation marks omitted). The test is "lenient" and "not especially demanding." *Id.* at 1389 (internal quotation marks omitted). In addition, "we generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." *Id.* at 1390. The petition before us easily fits within both of the presumptions *Lexmark* identifies, and, indeed, Dominion does

not dispute that Petitioners' claimed injuries are proximately caused by the Commission's approval of the Project.

Relying on our statement in *Grand Council of Crees v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000), that the zone of interests is to be determined "'by reference to the particular provision of law upon which the plaintiff relies,'" *id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997)), Dominion argues that Petitioners "rely" on the Natural Gas Act's savings clause in arguing that the Commission acted unlawfully. Because Petitioners' interests fall outside the "rights of States" protected by the savings clause, asserts Dominion, they fail the zone of interests test.

Dominion, however, understates the interests "arguably within the zone of interests to be protected or regulated" by the relevant provisions of the Natural Gas Act and the Clean Air Act. *Id.* at 954 (internal quotation marks omitted). The zone of interests test is not demanding. *See id.* at 955. A would-be plaintiff is outside the statute's "zone of interests" only if "the plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Petitioners here rely on provisions focused primarily on the preservation of state and local authority in the fields of environmental and land use regulation, and it is precisely injuries in those domains that Petitioners assert. The statutory provision at issue, moreover, need not be intended to benefit Petitioners; it is sufficient that the interest asserted arguably falls within the provision's scope. *Id.* at 2210 & n.7. The environmental injuries asserted by Petitioners suffice to bring a claim under the provisions of the Natural Gas Act and the

Clean Air Act they cite. We are not empowered to decline for prudential reasons to hear their claim.

Finally, we reject Dominion's reliance on *Delaware Department of Natural Resources & Environmental Control v. FERC*, 558 F.3d 575 (D.C. Cir. 2009), for the proposition that Plaintiffs lack Article III standing. There, we held that Delaware lacked Article III standing because it asserted only a "procedural injury" that was not accompanied by a "concrete substantive interest." *Id.* at 578-79. Importantly, Delaware identified no prejudice from the Commission's having approved a project before Delaware had completed its regulatory process under the Coastal Zone Management Act and the Clean Air Act, other than the potential for "intense political pressure to acquiesce in the Commission's conditional approval," which we held was not a cognizable injury. *Id.* at 578. In contrast to Delaware, Petitioners in this case have alleged various concrete injuries that they contend flow from the siting of the compressor station, including depressed property values, increased noise and air pollution, visual blight, and heightened safety risks. Their claims are not merely political or procedural. Petitioners have asserted a cognizable injury in fact stemming from the allegedly unlawful approval of the Project that is redressable through judicial review of the Commission's order.

**B.**

Turning to the merits, we begin by reviewing the regulatory background and *Dominion Transmission, Inc. v. Summers*, our earlier decision relating to the project at issue here. *See* 723 F.3d at 238.

The Clean Air Act "is an exercise in cooperative federalism." *Id.* at 240. The Environmental Protection Agency promulgates air quality standards, and the states, if

they wish, adopt state implementation plans (SIPs) "'providing for the implementation, maintenance, and enforcement of'" those air quality standards; "'such plans are then submitted to EPA for approval.'" *Id.* (quoting *Michigan v. EPA*, 213 F.3d 663, 669 (D.C. Cir. 2000)); *see also* 42 U.S.C. § 7410(a). Maryland's SIP, incorporated by reference in the Code of Federal Regulations, 40 C.F.R. § 52.1070, includes Maryland Code Section 2-404, a provision of the state's environmental law that governs permits to construct emissions sources such as the Myersville compressor station. Section 2-404(b)(1) prohibits the Maryland Department of the Environment (MDE) from accepting an application for an air quality permit unless the applicant submits documentation:

> (i) That demonstrates that the proposal has been approved by the local jurisdiction for all zoning and land use requirements; or

> (ii) That the source meets all applicable zoning and land use requirements.

In the summer of 2012, pursuant to Section 2-404(b)(1), the MDE refused to process Dominion's permit application because the compressor station had not "been approved by the local jurisdiction for all zoning and land use requirements" nor, in its view, had Dominion shown that the station "meets all applicable zoning and land use requirements." *Summers*, 723 F.3d at 241. Shortly thereafter, Myersville denied zoning approval for the proposed Myersville compressor station. *Id.* at 241-42. The Commission then issued its certificate order conditionally approving the Project. *Id.* at 242. "[W]ith FERC's certificate in hand, Dominion applied to the [MDE] once again for an air quality permit. Its cover letter stated it now satisfied § 2-404(b)(1) because all local zoning and land use requirements had been preempted by FERC's certificate

and were therefore not 'applicable.'" *Id.* The MDE again refused to process the application. *Id.*

Dominion then petitioned this Court to review Maryland's refusal to issue an air quality permit for a facility conditionally approved by the Commission. In *Summers*, we agreed with Maryland that Section 2-404(b)(1) formed a part of Maryland's SIP. *Id.* Consequently, by virtue of the Natural Gas Act's savings clause, we held that the Commission's certificate order approving the Allegheny Storage Project did not preempt Section 2-404(b)(1), and that the MDE was entitled to enforce it. *Id.* at 243-44.

We also held, however, that the MDE failed to enforce Section 2-404(b)(1) according to its terms. The MDE argued that it could refuse to process Dominion's permit application until Myersville granted the compressor station zoning approval. *Id.* at 244. We disagreed because the Natural Gas Act requires a state agency "to issue, condition, or deny" permits that federal law requires for subject facilities, and not merely to refuse to act on a permit application. 15 U.S.C. § 717r(d)(2). MDE contended that Dominion had not satisfied Maryland's SIP because it had not shown that it had met all applicable zoning and land use requirements by merely submitting its own letter claiming compliance; a letter from the local authorities, it claimed, was necessary. *Summers*, 723 F.3d at 244. We held, however, that "the plain meaning of § 2-404(b) . . . expressly permits the applicant to avoid involvement by the local zoning authority altogether," so requiring their written statement was contrary to law. *Id.* at 244-45. We reasoned that the use of the phrase "meets all applicable zoning and land use requirements," as an alternative to the subsection specifically referencing local approval, admitted the possibility that some such requirements might be satisfied other than by obtaining

affirmative approval from the local authorities. *Id.* at 245. Dominion's documentation might, for example, show that it had in fact met all the local requirements. We also considered the possibility that Section 2-404(b)(1)(ii) might, despite the savings clause preserving the "rights of States" under the Clean Air Act, be designed to invite some amount of preemption of those rights by the Natural Gas Act, rendering any preempted rights no longer "applicable." It thus struck us as at least plausible that, as a matter of Maryland law, Dominion might, without local approval in hand, "meet" all or some of whatever local requirements were "applicable." *Id.* We held that the MDE could not refuse to process an application without first evaluating which local laws were "applicable," and which were not. *Id.*

Importantly, however, we declined to determine in the first instance the scope of any preemption that may have been effected by the Commission's certificate order. In its order, the Commission had done the same thing, choosing to defer to Maryland to determine whether the Commission's order had any effect on the applicability of Myersville's local zoning laws. *See Certificate Order* ¶ 71. We thus remanded to the MDE to "either identify one or more 'applicable' (that is, not preempted) zoning or land use requirements with which Dominion has not demonstrated compliance, or . . . process Dominion's application for an air quality permit." *Summers*, 723 F.3d at 245.

On remand, the MDE concluded that the "only Myersville zoning or land use regulation that is applicable, i.e., not preempted by the Natural Gas Act, is a requirement for submission of a construction site plan to the Town." Resp. to Comments for the Dominion Transmission, Inc. Natural Gas Compressor Station, Md. Dept. Env. Docket No. 20-13, Permit Nos. 021-0707-5-0460 & -0461, at 3-4 (Jan. 16,

2014), available at http://www.mde.state.md.us/programs /Permits/AirManagementPermits/Documents/DTIResponseto Comments%20(1).pdf. Because Dominion had complied with the site plan requirement, the MDE processed Dominion's air quality permit application; the MDE then approved the application and issued an air quality permit on June 10, 2014.[4] Dominion Rule 28(j) Letter, Ex. A (filed June 24, 2014).

---

[4] The issuance of the air quality permit, after briefing in this case, rendered moot two arguments Petitioners made based on the Clean Air Act. First, they argued that the Commission could not approve a facility before an air quality permit issued because, if the state were to deny the requisite permit, the facility "may never be built." Pet'rs' Br. 32. Second, they argued that the Commission could not measure the compressor station's potential to emit based on a 6000 hour-per-year limitation that had not been incorporated into an enforceable air quality permit. Pet'rs' Br. 36. The air quality permit that the MDE has now issued for the construction of the Myersville compressor station incorporated that 6000 hour-per-year limitation. Both of those arguments are now moot. *See, e.g.*, *Schering Corp. v. Shalala*, 995 F.2d 1103, 1105 (D.C. Cir. 1993) (citing *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)). To the extent that Petitioners challenge the Commission's assessment of the compressor station's air quality impact more generally, the Commission's Environmental Assessment reflects that the Commission reviewed modeling performed by Dominion and agreed that, for a range of pollutants, the Myersville compressor station would not have a significant air quality impact or would otherwise be below the National Ambient Air Quality Standards. *See Certificate Order* ¶ 111, J.A. 206-07. Other than the now moot objection to the 6000 hours-per-year cap, Petitioners do not meaningfully challenge that analysis.

## C.

Petitioners point to two statutory bases for their challenge to the Commission's ability to issue a Section 7 certificate conditioned on an applicant's subsequent receipt of the requisite air quality permit. Neither supports their argument. First, they note that, to issue a certificate of public convenience and necessity, the Commission must conclude that the applicant is "able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder." 15 U.S.C. § 717f(e). That provision requires nothing more than a finding that the applicant is "able and willing" to comply with the Natural Gas Act and the "requirements, rules, and regulations" promulgated thereunder. Petitioners have not identified any requirement under the Natural Gas Act that Dominion could not satisfy. As for the Clean Air Act permit specifically, it is clear that Dominion was "able and willing" to do so; indeed, it did.

Second, Petitioners claim that the Commission's certificate "undermines the Clean Air Act as well," because the Clean Air Act "expressly preserves local authority." Pet'rs' Br. 34. But the provision on which they rely, 42 U.S.C. § 7431, states only that "[n]othing in [the Clean Air Act] constitutes an infringement on the existing authority of counties and cities to plan or control land use." It does not purport to constrain the Commission beyond the constraints already provided by the Natural Gas Act and the Clean Air Act.[5]

---

[5] An arguably relevant provision of the Clean Air Act, cited only by the Commission, is 42 U.S.C. § 7506(c)(1), which provides that

The lack of those claimed legal prohibitions against the Commission issuing a conditional certificate does not resolve what effect, if any, that certificate might have on Maryland's decision whether and on what terms to issue an air quality permit. The Commission's power to preempt state and local regulation by approving the construction of natural gas facilities is limited by the Natural Gas Act's savings clause, which provides that the Natural Gas Act's terms must not be construed to "affect[] the rights of States" under the Clean Air Act. 15 U.S.C. § 717b(d)(2). Invoking our decision in *Summers*, Petitioners assert that the Commission affected Maryland's Clean Air Act rights because its certificate order preempted then-"applicable" zoning and land use requirements, removing them as obstacles to Dominion's air quality permit. Had the Commission's conditional certificate not issued unless and until Maryland granted the requisite Clean Air Act permit, Petitioners argue, Dominion could not have secured the permit. In thus "affect[ing] the rights of" Maryland under the Clean Air Act, contend Petitioners, the Commission violated the savings clause.

---

"[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." It appears the Commission decided that it was not required to perform a § 7506 general conformity determination. J.A. 211-12. Petitioners have not challenged that decision, so we decline to address it and express no opinion on whether § 7506 affects the Commission's authority to issue Section 7 certificates conditioned on the receipt of air quality permits. *See* 40 C.F.R. §§ 93.153 (applicability of conformity determination requirement), 93.158 (criteria for determining conformity).

We conclude that the effect Petitioners complain of is illusory, premised on a misunderstanding of our *Summers* decision, the statutory scheme, and the operation of preemption in this case. While Petitioners claim that the Commission's Section 7 certificate had the effect of unlawfully influencing the MDE's consideration of Dominion's application for an air quality permit, their objections largely boil down to a challenge to the *MDE's* decision regarding the preemptive interaction between the certificate and the relevant provisions of Maryland law, not to the Commission's freestanding authority to issue a conditional certificate. The propriety of the MDE's decision, however, is not properly before this court.

Maryland's rights under the Clean Air Act are those that it can exercise under its SIP.[6] *Cf. AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 126 (4th Cir. 2008) (holding "rights of States" under Coastal Zone Management Act are those rights that states can "exercise" under their Coastal Management Plans, analogues to Clean Air Act SIPs). While the Commission's certificate order set forth the preemption standard as the Commission understands it, the Commission did not purport to preempt any local law, nor any portion of Maryland's SIP. Indeed, it did not even identify whether any conflict with state or local law existed, as it explicitly declined to interpret "local, state and federal laws that are outside of the Commission's jurisdiction." *Certificate Order* ¶ 71 ("[T]he Maryland state and local agencies retain full authority to grant or deny air quality permits; if the State of

---

[6] To the extent Petitioners' claim rests on an assumption that the "rights of States" under the Clean Air Act extend beyond their power to enforce the provisions of their SIPs, no party has briefed the argument, and we decline to address it. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003).

Maryland rejects [Dominion's] air quality permit application, or refuses to process it, then it is up to [Dominion] to determine how it wishes to proceed."). In addition, the Commission conditioned the certificate on Dominion's ability to secure all necessary federal authorizations, including the requisite federal Clean Air Act air quality permit obtainable from the MDE. *Certificate Order*, App. B, Env'l Condition 8.

We, too, declined in *Summers* to determine the scope of any preemption that might have been effectuated by the Commission's certificate order. We recognized that Section 2-404(b)(1) is part of Maryland's SIP, and therefore saved from preemption. We also decided, however, that the MDE was "better situated" to interpret the SIP and determine in the first instance the scope of the Natural Gas Act's preemptive footprint and the extent to which local land use and zoning law is incorporated into Maryland's SIP, and thereby shielded from preemption by the Natural Gas Act's savings clause. 723 F.3d at 245.

In *Summers*, Dominion argued that Section 2-404(b)(1)(ii) does not incorporate any local land use laws in a way that would save them from preemption by the Commission. Rather, Dominion argued, the provision refers only to "applicable" laws because it anticipates the possibility that some laws will not be "applicable" by virtue of preemption. Petitioners read the word "applicable" as it appears in Section 2-404(b)(1)(ii) more broadly. Under Petitioners' view, Maryland's SIP incorporates Maryland's zoning and land use requirements wholesale, saving them from preemption by the Commission. Advancing that view, Petitioners are participating in a challenge in Maryland state court to the MDE's decision to process Dominion's air quality permit application. *See* Oral Arg. Tr. 18.

We decline here, as we did in *Summers*, to address which interpretation of Section 2-404(b)(1)(ii) is correct, because it makes no difference in this case. The Commission's certificate order has no bearing on what is and is not included in Maryland's SIP, and therefore has no bearing on what are or are not Maryland's "rights" saved by the Natural Gas Act's clause preserving the "rights of States" under the Clean Air Act. The Commission did not "force[] MDE to accept an air quality permit application which would have otherwise been deemed deficient." Pet'rs' Br. 34. Nor did we.

Regardless of how the scope of Section 2-404(b)(1) is accurately described, the Commission did not act unlawfully in granting a conditional certificate order. Correctly understood, Petitioners' complaint appears to be not with the certificate order as such, but with the MDE's interpretation of its SIP in the wake of *Summers* and the certificate order. If Petitioners are right that the SIP's reference to Section 2-404(b)(1)(ii) saves Myersville's zoning and land use laws from preemption, it was the MDE, not the Commission, that erred by treating the Commission's certificate order as preempting more than, by hypothesis, it lawfully could. Conversely, if the MDE correctly concluded that the SIP does not, under the circumstances here, require compliance with Myersville's zoning laws, then, by the same token, the Commission did not exceed its statutory authority. In any event, the certificate order did not affect Maryland's Clean Air Act rights. Under either interpretation, the certificate order has only whatever preemptive force it can lawfully exert, and no more. It did not purport to contravene the Natural Gas Act's savings clause. Nor did it purport to compel the MDE's interpretation of Maryland's SIP.

The precise scope of Maryland's SIP and the preemptive effect of the Commission's order is not before us. Petitioners

may continue to challenge the MDE's conclusion on that score in the appropriate forum. We are called on to decide only whether it was lawful for the Commission to approve the Allegheny Storage Project subject to its compliance with Maryland's Clean Air Act permitting process. Because no provision of the Natural Gas Act or the Clean Air Act identified by Petitioners barred the Commission from issuing a conditional Section 7 certificate under these circumstances, and the preemptive effect of that decision in light of the interaction of the two Acts and Maryland's SIP is not properly before us, we hold that Petitioners' challenges must be rejected.

## IV.

Petitioners claim error in the Commission's performance of its obligations under the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852 (codified as amended at 42 U.S.C. § 4321 *et seq.*), which requires federal agencies to "consider fully the environmental effects of their proposed actions." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) (internal quotation marks omitted). Any proposed "major Federal action[] significantly affecting the quality of the human environment" triggers in an agency the obligation to prepare an Environmental Impact Statement (EIS) discussing in detail the environmental impact of the proposed action, alternatives to the action, and other considerations. 42 U.S.C. § 4332(C). An agency may preliminarily prepare an Environmental Assessment (EA) to determine whether the more rigorous EIS is required. *See* 40 C.F.R. §§ 1501.4, 1508.9. An EIS is unnecessary if an agency makes a "finding of no significant impact" (FONSI) on the human environment; a FONSI discharges the agency's NEPA documentation obligations. 40 C.F.R. §§ 1508.9(a)(1), 1508.13; 18 C.F.R. § 380.2(g). An agency's NEPA

obligations are "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA does not require any particular substantive result. *Id.*; *see also Theodore Roosevelt Conservation P'ship*, 661 F.3d at 68.

Here, the Commission prepared an Environmental Assessment of the Allegheny Storage Project. Finding that the Project "would not constitute a major federal action significantly affecting the quality of the human environment," the Commission prepared a FONSI and declined to prepare an EIS. J.A. 242. Petitioners challenge the Commission's Environmental Assessment, arguing that it failed adequately to consider alternatives, that it failed fully to consider the impact on local residents' property values, and that it unlawfully segmented its environmental review of the Allegheny Storage Project and Dominion's Cove Point LNG export terminal, which Petitioners contend the Commission should have reviewed together as a single project.

We overturn an agency decision under NEPA only if it is arbitrary and capricious, an abuse of discretion, or if the agency has failed to satisfy the procedural requirements of the statute. *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72. To issue a FONSI and decline to prepare an EIS, an agency must have concluded that "there would be no significant impact or have planned measures to mitigate such impacts." *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 (D.C. Cir. 2008). Our role in reviewing an agency's decision not to prepare an EIS is a "'limited'" one, "designed primarily to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988)). We ask "whether the agency '(1) has accurately identified the relevant environmental concern, (2) has taken a

hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Mich. Gambling*, 525 F.3d at 29 (quoting *TOMAC*, 433 F.3d at 861). In both the EA and EIS contexts, this court applies a "rule of reason" to an agency's NEPA analysis and has repeatedly refused to "flyspeck" the agency's findings in search of "any deficiency no matter how minor." *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006); *see also Minisink*, 762 F.3d at 112.

**A.**

An Environmental Assessment must include a "brief discussion[]"of reasonable alternatives to the proposed action. 40 C.F.R. § 1508.9(b). An alternative is "'reasonable' if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (alterations in original) (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999)); *see also* 43 C.F.R. § 46.420(b) (defining "reasonable alternatives" in the context of an EIS as those alternatives "that are technically and economically practical or feasible and meet the purpose and need of the proposed action"). The Commission's specification of the range of reasonable alternatives is entitled to deference. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Although a consideration of alternatives is required regardless of whether the agency issues a FONSI, the relevant regulations provide that the consideration of alternatives in an Environmental Assessment need not be as rigorous as the consideration of alternatives in an EIS. *Compare* 40 C.F.R. § 1508.9(b) (requiring "brief discussion[]" of alternatives in

an EA) *with id.* § 1502.14(a) (requiring agency to "[r]igorously explore and objectively evaluate all reasonable alternatives" when EIS required). *See also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) ("[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS") (internal quotation marks omitted); *La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 357 (5th Cir. 2006) ("[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial.") (second alteration in original) (internal quotation marks omitted); *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998); *Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992); *Olmsted Citizens for a Better Cmty. v. United States*, 793 F.2d 201, 208 (8th Cir. 1986); *River Rd. Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 452 (7th Cir. 1985).

Petitioners claim that the Environmental Assessment lacks adequate consideration of two alternatives—an "existing pipeline" alternative and a "looping" alternative.[7] On both counts, Petitioners mischaracterize the Environmental Assessment, which considered and rejected both alternatives, adequately discharging the Commission's NEPA obligations.

First, Petitioners argue that "there are numerous other pipeline systems in the region that could be used to meet" the needs of Dominion's customers. Pet'rs' Br. 40. The Commission's Environmental Assessment rejected the

---

[7] Although Petitioners also discuss the alternative of an electric compressor three times in passing, *see* Pet'rs' Br. 6, 15, 20, they do not make any argument specific to that alternative, so we decline to address it.

proposition that there was existing, unused capacity that could satisfy the new demand. J.A. 233 (apart from alternatives considered in EA, the Commission "did not identify any other existing pipeline systems in the region that could provide the capacity of the Project."). Petitioner Ted Cady, seeking rehearing, listed five pipeline systems that he believed had sufficient unused capacity. J.A. 416-17. His request for rehearing provided no explanation or technical analysis, however, relating to whether those pipelines are fully subscribed, for example, or whether they are located so as to be able to serve Dominion's customers. Because the record is devoid of evidence that the Commission unreasonably concluded that the construction of new facilities was needed to meet demand, and that the use of existing pipelines was not feasible, we decline to second-guess the Commission. The Commission's consideration of the "existing pipeline" alternative in its Environmental Assessment was adequate.

Second, Petitioners argue that the Commission inadequately considered the "looping" alternative, which would have involved a thirty-mile loop of pipeline rather than a compressor station in Myersville. The Commission rejected the looping alternative because building it would disturb more land than would building the compressor station. *See* J.A. 234. In the Commission's view, a pipeline loop "would cause a greater environmental disturbance" than would the compressor station, so the loop was "not an environmentally preferable" alternative. *Id.* Petitioners claim the Commission's finding was flawed because the loop would cost only $2 million more than the compressor station, but would result in no emissions. NEPA, however, does not require a general focus "on the monetary costs and benefits of the respective proposals . . . particularly where only an environmental assessment, rather than an environment impact statement, is involved." *Minisink*, 762 F.3d at 112; *see*

*Webster v. USDA*, 685 F.3d 411, 430 (4th Cir. 2012). And NEPA does not compel a particular result. Even if an agency has conceded that an alternative is environmentally superior, it nevertheless may be entitled under the circumstances not to choose that alternative. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

Petitioners also assert that the Commission overestimated the amount of land that would be disturbed by the looping option. The Commission estimated 527 acres for construction and operation; Petitioners estimated 102. *See* J.A. 500. That challenge falls under the category of "flyspecking," and encroaches on the deference to which the Commission is entitled for its technical analysis. The Commission stands by its estimate, and, in any case, responds that Petitioners' lower estimate would not have changed its analysis, since it far outstrips the 21-acre land disturbance required for construction and operation of the Myersville compressor station. *See* Resp.'s Br. 35. The looping option would require a significantly greater amount of land than the compressor station, and would adversely affect the environment in other significant ways discussed in the Environmental Assessment. The Commission adequately considered, and rejected, the looping option. That was sufficient to discharge its NEPA obligations.

**B.**

Petitioners also argue that the Environmental Assessment failed to take a "hard look" at "quantifying the impacts of the project on property values and lost development

opportunities" in Myersville. Pet'rs' Br. 42. The definition of "hard look" may be "imprecise," but we have explained that an agency has taken a "hard look" at the environmental impacts of a proposed action if "'the statement contains sufficient discussion of the relevant issues and opposing viewpoints,' and . . . the agency's decision is 'fully informed' and 'well-considered.'" *Nevada*, 457 F.3d at 93 (quoting *NRDC v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988)).

In response to community concern about the Myersville station's potential impact on property values, the Environmental Assessment noted that each purchaser of property has different criteria and values, but that, generally speaking, a compressor station could depress property values, particularly those of adjacent and nearby land. J.A. 200. Nevertheless, the Commission concluded that the Myersville compressor station "would not significantly reduce property or resale values" in Myersville because of the Commission's recommendations for noise and visual screening. *Id.* Views of the compressor station would be significantly screened by natural vegetation both in summer and winter, and there would be "no perceptible operational noise from the compressor station at the nearest residences." *Id.* Indeed, the compressor station would contribute less noise and vibration to the local area than is already produced by the portion of I-70 running next to it. J.A. 218.

The Commission also acknowledged the "lack of studies evaluating property values and aboveground natural gas facilities," and that "the effects on property values are difficult to quantify." J.A. 200. Seizing on that statement, Petitioners argue that the Commission should be required to do more to take into account the effects that safety concerns and pollution have on property values. But the Commission acknowledged three times, in the Environmental Assessment,

in its certificate order, and in its order denying rehearing, that property values could be negatively affected by the compressor station. It chose nevertheless to approve the project because the negative impact was not "sufficient to alter our determination that the Myersville Compressor Station is required by the public convenience and necessity." *Certificate Order* ¶ 104.

In *Minisink*, we recently turned away a challenge similar to this one. The Commission acknowledged the *Minisink* project's adverse effects on property values but nevertheless approved it. Because the Environmental Assessment in *Minisink* "clearly addressed this issue," and because the Commission concluded that some of those property-value effects could be mitigated through visual screening, we found the Environmental Assessment was adequate. 762 F.3d at 112. The same is true here. "Though we can see how Petitioners may disagree with [the Commission's] takeaway, their disagreement does not mean that the Commission failed to consider the issue altogether, as they suggest." *Id.*

Petitioners also argue that the Commission should be required to take into account the impact on property values stemming from "preemption." Pet'rs' Br. 42-43. According to Petitioners, "[a]s a result of preemption, the Town of Myersville and its residents suffered a loss because a site that would have once sustained uses that would benefit the community has now been taken off the market by Dominion." *Id.* at 43. It is not clear what independent effects on Petitioners' property value they argue would stem from "preemption" as opposed to the construction and operation of the compressor station, which the Environmental Assessment evaluated, and we decline to guess. The Commission's consideration of this issue was reasonable as well. *See Rehearing Order* ¶ 64.

## C.

Finally, Petitioners reiterate their assertion that the "overbuilt" Allegheny Storage Project will produce excess natural gas capacity destined for export through Dominion's Cove Point LNG terminal. By virtue of that alleged connection between the Project and Cove Point, Petitioners argue that the Commission should be required to review their environmental effects together.[8]

Under applicable NEPA regulations, the Commission is required to include "connected actions," "cumulative actions," and "similar actions" in an Environmental Assessment. 40 C.F.R. § 1508.25(a)(1)-(3). "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (internal quotation marks omitted). "The purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Hodel*, 865 F.2d at 297 (internal quotation marks omitted). "Connected actions" include actions that are "interdependent parts of a

---

[8] We conclude that Petitioners' argument is adequately preserved because it was raised below, if briefly, and the Commission addressed the issue in denying rehearing. *See Rehearing Order* ¶ 33 n.31.

larger action and depend on the larger action for their justification."[9]  40 C.F.R. § 1508.25(a)(1)(iii).

Petitioners claim that the Cove Point LNG export project is a "connected action" that NEPA requires be considered together with the Allegheny Storage Project.  In *Delaware Riverkeeper*, we held that the Commission unlawfully segmented its environmental review where four other pipeline projects were "certainly 'connected actions'" that, taken together, would result in "a single pipeline," that was "linear and physically interdependent," and contained "no physical offshoots."  753 F.3d at 1308, 1316.  In addition, the other pipelines were under construction or pending review when the contested application was filed, the Commission's review of the projects was overlapping, and their cumulative effects were visited on the same environmental resources.  We premised our decision requiring joint NEPA consideration on the unquestionable connectedness of the projects, the fact that the projects all were under consideration by the Commission at the same time, and the fact that the projects were financially interdependent.  *Id.* at 1318.

The absence of all of those factors led us to reject an analogy to *Delaware Riverkeeper* in *Minisink*.  There, as here, the petitioners argued that a project that the Commission found unrelated was nevertheless a "connected action."  We rejected that argument and distinguished the connectedness and timing of the projects at issue in *Delaware Riverkeeper*.  *Minisink*, 762 F.3d at 113 n.11.  The same distinctions apply

---

[9] "Connected actions" also include actions that "(i) [a]utomatically trigger other actions which may require environmental impact statements," and actions that "(ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously."  40 C.F.R. § 1508.25(a)(1)(i)-(ii).

here. Unlike in *Delaware Riverkeeper*, the Commission in this case made clear that the Allegheny Storage Project and the Cove Point LNG terminal are unrelated, and that neither depends on the other for its justification. *See* 40 C.F.R. § 1508.25(a)(1)(iii). This is therefore not a case in which "financially and functionally interdependent pipeline improvements were considered separately even though there was no apparent logic to where one project began and the other ended." *Del. Riverkeeper*, 753 F.3d at 1318. The absence of evidence that would compel a finding of connectedness between the Allegheny Storage Project and the Cove Point LNG export terminal defeats Petitioners' challenge.

**V.**

Finally, Petitioners Cady and Gerner claim they suffered due process violations because the Commission failed to provide them with a meaningful opportunity to comment on the Environmental Assessment. Petitioners claim they were deprived of a "meaningful opportunity" to comment on Critical Energy Infrastructure Information (CEII) that they requested from the Commission—in particular, Dominion's hydraulic flow diagrams.[10]

---

[10] CEII is "specific engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure that: (i) Relates details about the production, generation, transportation, transmission, or distribution of energy; (ii) Could be useful to a person in planning an attack on critical infrastructure; (iii) Is exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552; and (iv) Does not simply give the general location of the critical infrastructure." 18 C.F.R. § 388.113(c)(1).

Due process challenges to agency action are subject to the general prejudicial error rule. *See Air Canada v. Dep't of Transp.*, 148 F.3d 1142, 1156-57 (D.C. Cir. 1998); 5 U.S.C. § 706. "Due process requires only a 'meaningful opportunity' to challenge new evidence." *BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473, 486 (D.C. Cir. 2006) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 349 (1976)); *see also Blumenthal v. FERC*, 613 F.3d 1142, 1145-46 (D.C. Cir. 2010). In *BNSF Railway*, we observed that, even where an opportunity to rebut evidence may be obstructed at one point in a proceeding, a rebuttal opportunity that arises before the issuance of a final order is sufficient for purposes of due process. *See* 453 F.3d at 486; *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div.*, 312 U.S. 126, 152-53 (1941) ("The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective.")).

Consequently, we have held that a commenter before the Commission who has ample time to comment on evidence before the deadline for rehearing is not deprived of a meaningful opportunity to challenge the evidence. *Minisink*, 762 F.3d at 115. Cady and Gerner argue that they received the CEII too late to comment at their preferred time in the proceeding, but neither contends that they lacked ample time to comment on the evidence before the deadline to seek rehearing. We conclude that Petitioners Cady and Gerner both had a "meaningful opportunity" to challenge the CEII before rehearing, and therefore suffered no prejudice from any alleged procedural deficiency in the way the CEII was produced to them.

Moreover, Petitioners do not identify what they would have done differently with the CEII had the Commission

produced it earlier in the proceeding. "To show that error was prejudicial, a plaintiff must indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity." *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002) (internal quotation marks omitted). Petitioners have failed to satisfy that standard.

\* \* \*

Because each of Petitioners' challenges to the Commission's conditional approval of the Allegheny Storage Project falls short, the petition for review is denied.

*So ordered.*